UNITED STATES of America, Appellee,

v.

Tyjuan JONES, Appellant.

No. 84–1846.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1984.

Decided April 10, 1985.

Rehearing Denied May 13, 1985.

Martin Zucker, St. Louis, Mo., for appellant.

Debra Herzog, St. Louis, Mo., for appellee.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The main issue before us is at what point a show of force by police will elevate an intended investigative stop into an arrest which, in the absence of probable cause, would warrant exclusion of evidence thereby seized as violative of the fourth amendment. The district court[1] denied Tyjuan Jones' motions to suppress and in limine and allowed the introduction into evidence of the handgun found in the car in which Jones was apprehended. Jones was convicted as a felon in possession of a firearm

---

1. The Honorable James H. Meredith, Senior United States District Judge for the Eastern District of Missouri.

in violation of 18 U.S.C.App. § 1202(a)(1) (1982). We affirm.

On Sunday afternoon December 11, 1983, Tyjuan Jones, accompanied by his two sons and nephew, all less than twelve years old, was on his way to visit his father when he stopped at the apartment of a friend. While he was waiting on the doorstep for an answer to the security buzzer, police detectives Terry James and Kurt Shrum, on routine patrol in business suits and an unmarked car, observed Louis Brown, who was known to them as a burglar, walking away from the rear of the same apartment building at which Jones was standing. Brown, upon appearing to notice the officers, put his hand over his face. James and Shrum called Brown to their car and conducted a pat-down frisk, which revealed no weapons or stolen property. At the same time Detective James noticed Jones at the door of the apartment building. Jones then, upon also appearing to see the officers, turned and ran through a gangway to the rear of the apartments where his sister's yellow Volkswagen, which he had been driving, was parked.

Knowing that burglars often worked in pairs, the detectives suspected that Jones might have been serving as a lookout while Brown broke in the back of the apartment building. James followed Jones on foot while Shrum put Brown in the back seat of the unmarked police car, drove around behind the apartments, and stopped directly behind and perpendicular to the Volkswagen which Jones had entered and in which he was then sitting with the three children. As Jones started the car, detectives James and Shrum approached with guns drawn. They ordered Jones to get out and asked him for some identification. While Jones did state that he did not live in the neighborhood, he repeatedly refused to get out of the Volkswagen, insisting that he did not know James and Shrum were police officers. There was testimony that the detectives had shown their badges several times during the exchange.

Also, at one point Shrum, in an attempt to get Jones out of the car, opened the back door of the Volkswagen on the driver's side and leaned in and, according to some witnesses, pointed his gun at Jones' head. Though the sequence is not clear, the officers apparently had their guns in and out of their holsters at various times during the encounter with Jones.

Finally, Shrum reached into the Volkswagen through the front driver's side window, which was down four or five inches, pulled up the knob, and pulled down on the door handle. The door, however, was broken and wouldn't open. Jones then took both hands, cranked the window shut on Shrum's arm, and yelled to the child in the front seat, "Give it to me, hand it to me, it's between the seats." As Jones released his right hand from the window crank and put the car in reverse so that it began to move backward, Shrum saw a small pistol between the seats. When he saw Jones release the shift lever and start for the pistol, Shrum reached his left hand to his shoulder holster, withdrew his revolver, and fired directly down through the window to break the glass and free his arm and to stop Jones from getting the pistol. Jones was struck by Shrum's shot. The encounter was estimated to have lasted three to six minutes.

Pursuant to the subsequent arrest and search, police seized the pistol from the Volkswagen and some bullets from the pocket of the jacket Jones had been wearing. Jones was charged as a felon in possession of a firearm in violation of section 1202(a)(1), and the district court, after a hearing, denied his pretrial motion to suppress. The court characterized the evidence as "uncontradicted basically" and made oral findings of fact from the bench as follows:

> The policeman came up to the car, he had a gun, he had seen Mr. Brown, a known burglar in the vicinity, and saw him running away. And he asked Mr. Jones to get out of the car and Mr. Jones said, "What for?" The police officer, he showed him his badge and he said he wouldn't get out of the car. He asked him on several occasions and showed him

the badge on two or three occasions, and additionally, after he twisted his arm in the window, * * * he took the gun and fired * * *.

Motion to suppress, transcript at 2–46, *United States v. Jones*, No 84–55 Cr (C) (E.D.Mo. May 18, 1984). The district court also said, "The policeman saw the gun on the floor of the car, so he had a perfect right to question Mr. Jones," and "I believe he had a right to question Mr. Jones. Mr. Jones refused to get out of the car." *Id.* at 2–47.

The district court similarly denied a motion in limine at trial and at the conclusion of all evidence made the additional finding that the Volkswagen had not been blocked in by the police car. The court resolved conflicting testimony to find the police car had been at least five feet behind the Volkswagen and interpreted photographic evidence as showing that there had been sufficient room at the front and left for the Volkswagen to have pulled away. Accordingly, the court concluded, the initial actions of the officers had not constituted an "arrest" of Jones. Jones subsequently was found guilty by a jury and was sentenced to the maximum penalty of two years.

On appeal Jones argues that the challenged evidence was inadmissible as the fruits of his seizure in violation of the fourth amendment. Specifically, he contends that the finding that the Volkswagen was not blocked is clearly erroneous and that he was arrested without probable cause at the time of the blocking and the officers' approach with guns drawn. Alternately, Jones argues that Shrum and James lacked even the reduced "reasonable suspicion" necessary were their actions to be characterized as a limited "investigative stop" permissible under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

## I

■ Our initial inquiry in this case is when an investigative stop crosses the boundary and becomes an arrest. *United States v. Danielson*, 728 F.2d 1143, 1146 (8th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984). An "arrest" to be valid under the fourth amendment requires probable cause. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Thus, since the government does not argue that officers Shrum and James had probable cause on first approaching the Volkswagen, if we find an arrest, we must find error in the failure to suppress the gun as the fruit of the illegal seizure of Jones. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). If, however, we find the confrontation between Jones and the officers constituted only an investigative stop, we must reach the question whether the actions of Shrum and James were supported by "reasonable articulable suspicion." *United States v. Sadosky*, 732 F.2d 1388, 1391 (8th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984); *see Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–81.

■ The Supreme Court held in *Dunaway* that despite the absence of a technical arrest probable cause may still be required when a detention is "in important respects indistinguishable from a traditional arrest." 442 U.S. at 212, 99 S.Ct. at 2256. "An action tantamount to arrest," we thus have stated, "has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984). There is, however, no "litmus-paper test" or "sentence or paragraph" rule to determine when, given the "endless variations in facts and circumstances," police-citizen encounters exceed the bounds of mere investigative stops. *Florida v. Royer*, 460 U.S. 491, 506–07, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983). In general, officers may take such steps as are "reasonably necessary to protect their personal safety and to maintain the status quo" so that the limited purposes of the stop may

be achieved.[2] *United States v. Hensley*, — U.S. —, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985).

Officers James' and Shrum's stop of Jones cannot be faulted for any of the excesses thus far identified in Supreme Court precedent. The Court has required probable cause when a petitioner, although not "booked," was taken from his home to the police station for custodial interrogation, *Dunaway*, 442 U.S. at 216, 99 S.Ct. at 2258, and when a drug suspect stopped in an airport was taken from the concourse to a private room by officers holding his plane ticket and driver's license when there was no compelling reason for the move beyond a desire to search the suspect's luggage. *Royer*, 460 U.S. at 503–05, 103. S.Ct. at 1327–28. The encounter involving Jones, in contrast, consisted only of an "on the street" exchange confined to the spot where Jones was found. *Dunaway*, 442 U.S. at 209, 212, 99 S.Ct. at 2254, 2256. The detention was brief, *see Royer*, 460 U.S. at 500, 103 S.Ct. at 1325; *see also United States v. Sharpe*, — U.S. —, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), and it did not involve questioning beyond a request for identification and explanation by Jones of his presence. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). Jones, however, contends that certain other aggravating factors—the blocking of the car, the officers' approach with guns drawn, and their persistent efforts to get him out of the car when he refused to exit

and refused to identify himself—similarly should be found to have made the encounter indistinguishable from a traditional arrest.

### A.

◼ We do not believe that any blocking by itself could have converted the stop into an arrest.[3] The test is not, as argued by Jones, whether a reasonable person would have felt free to leave under the circumstances: That concern marks the line between a fourth amendment seizure of any degree and a consensual encounter which does not require any minimal objective justification. *Immigration & Naturalization Service v. Delgado*, — U.S. —, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980). Nor is the test whether a citizen's freedom of movement in fact actually has been restricted: Even the investigative stop in the seminal *Terry* decision involved some use of physical force, as the officer grabbed Terry and spun him around. 392 U.S. at 7, 88 S.Ct. at 1872; *see Michigan v. Summers*, 452 U.S. 692, 698 n. 7, 101 S.Ct. 2587, 2592 n. 7, 69 L.Ed.2d 340 (1981); *but see Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. The Supreme Court since has explicitly stated,

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or crimi-

---

**2.** An investigative, in contrast to an accusatory, purpose, however, is not in itself controlling: "In the name of investigating a person who is no more than suspected of criminal activity * * * the police [may not] seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *see Dunaway*, 442 U.S. at 214, 99 S.Ct. at 2257.

**3.** The district court found that the Volkswagen in which Jones was sitting had not been blocked by the police car. The estimates of the distance between the two vehicles ranged from three feet to ten to fifteen feet, and the five-foot figure settled on as a minimum by the district court recognizes Jones' own testimony. Also, while Shrum testified that he had blocked the Volks-

wagen with the police car, he further stated that there had been room for the Volkswagen to pull out, though maybe not on the first pass. A finding by a district court is entitled to great deference and may not be rejected unless clearly erroneous, *Anderson v. City of Bessemer City*, — U.S. —, —, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518 (1985); *see United States v. Martin*, 706 F.2d 263, 265 (8th Cir.1983); however, we have serious doubts whether, in light of maneuvering that would have been required to drive away, Jones was not at least in a practical sense blocked in. Because of our resolution of the legal issues, we need not reach this question but will instead assume, as argued by Jones, that the officers blocked the Volkswagen.

nal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at that time.

*Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1922–23, 32 L.Ed.2d 612 (1972) (citation omitted).

Relying in part on this passage, *United States v. Patterson*, 648 F.2d 625, 632, 633 (9th Cir.1981), recognized that to hold that any complete, though brief, restriction of liberty was an arrest would defeat the purpose of investigative stops and make illusory much of the police flexibility acknowledged as desirable by the Supreme Court in *Terry*. Officers would have few alternatives to consensual encounters short of arrest. *See Terry*, 392 U.S. at 10–11, 88 S.Ct. at 1874–1875. Several circuits [4] thus conclude that an officer may impose a momentary restriction on freedom of movement "to maintain the status quo while making an initial inquiry, provided the force displayed is not excessive under the circumstances." *Patterson*, 648 F.2d at 633. Blocking generally will be reasonable when the suspect is in a vehicle because of the chance that the suspect may flee upon the approach of police with resulting danger to the public as well as to the officers involved.[5] *See United States v. White*, 648 F.2d 29, 35, 38 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981).

■ The same rule applies to a show of weapons: An approach to a car by officers with guns drawn does not elevate an investigative stop into an arrest if the police action is reasonable under the circumstances. *United States v. Danielson*, 728 F.2d 1143, 1147 (8th Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984). A possibility that the suspect was armed or an attempt by the suspect to evade detention frequently is emphasized or even deemed essential to make a show of guns reasonable. For example, in *Danielson*, we noted that if the officers' suspicions were confirmed, the occupants of the vehicle stopped "would certainly be armed with a shotgun and pistol." *Id.* Other circuits, however, do not always find these elements controlling. *E.g., United States v. Roper*, 702 F.2d 984, 988 (11th Cir.1983); *United States v. White*, 648 F.2d 29, 35–36 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981). As the D.C. Circuit concluded in *White*,

---

4. *E.g., United States v. Bautista*, 684 F.2d 1286, 1289–90 (9th Cir.1982) (handcuffing of suspect didn't convert stop into arrest when reasonable as a protective measure), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983); *United States v. Harley*, 682 F.2d 398, 402 (2d Cir.1982) ("If there is sufficient reasonable suspicion to justify an investigative stop, reasonable force may be used to effect that stop."); *United States v. Moore*, 638 F.2d 1171, 1174–75 (9th Cir.1980) (placement of suspects in caged rear seat of police car didn't convert stop into arrest when suspects were informed they were just being detained until customs officials arrived and mode of detention was reasonable under circumstances), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *United States v. Vargas*, 633 F.2d 891, 896 (1st Cir. 1980) (boxing-in of vehicle and command that occupants raise their hands not inconsistent with investigative stop under circumstances); *United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir.1976) (officer making stop entitled to use reasonable force, in the form of handcuffing, to maintain status quo). *See generally*, 3 W. La-Fave, *Search and Seizure* § 9.2(d) (1978 & Supp. 1985).

5. For example, in *United States v. Harley*, 682 F.2d 398 (2d Cir.1982), when the police initially merely pulled alongside and waved a vehicle over, the suspect ran a red light and led the officers on a three-mile chase at speeds of up to ninety miles per hour. As Judge Meskill said dissenting in *United States v. Ceballos*, 654 F.2d 177, 188 (2d Cir.1981): "[B]locking of his [the suspect's] automobile was * * * certainly preferable to a wild, reckless chase through dark city streets." *See also Patterson*, 648 F.2d at 633 ("The Constitution does not require them [police officers] to have given him [suspect] a head start. He was in the driver's seat with the motor running. Blocking the car was a reasonable precaution to ensure that the inquiry would not be terminated prematurely.").

Though this case would be easier if it involved a dark and deserted spot or one lone officer facing a carful of suspects, our reluctance to second-guess the judgment of experienced officers is not limited to such extreme situations. * * * Reviewing the situation through the "eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," we cannot say that the officers acted unreasonably in being prepared for possible violence.

*Id.* at 36 (footnote and citations omitted).

The case primarily relied on by Jones,[6] *United States v. Ceballos,* 654 F.2d 177 (2d Cir.1981), similarly looks to the situation confronting the officers and does not establish a per se rule that a display of weapons, even combined with blocking, transforms a stop into an arrest. *See United States v. Harley,* 682 F.2d 398, 401 (2d Cir.1982). In *Ceballos,* the Second Circuit found the blocking of a vehicle and approach with guns drawn excessively intrusive because the suspect had engaged in no erratic or elusive behavior and the police articulated

no facts which they had viewed as creating the need for a greater show of force than usually associated with a *Terry* stop. *Id.* at 183–84. The police tactics could not be grounded in the dangers of approaching an automobile when it appeared that the suspect could have been stopped on the street before he entered his car. *Id.* Furthermore, at least three police cars were involved in the blocking. *Id.* at 180.

Cases such as *Ceballos* involving blocking of vehicles and police shows of weapons[7] suggest several factors to which we might look in determining whether the force used by officers Shrum and James was reasonable and thus in keeping with characterization of this encounter as an investigative stop. The factors variously cited by courts include the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers and lack of oppor-

**6.** Jones also cites *Jackson v. United States,* 408 F.2d 1165, 1168–69 (8th Cir.), *cert. denied,* 396 U.S. 862, 90 S.Ct. 135, 24 L.Ed.2d 114 (1969), and *United States v. Beck,* 598 F.2d 497 (9th Cir.1979). We do not find the form of restriction of movement here equivalent to that in *Jackson.* Further, *Jackson* was decided shortly after *Terry* and thus substantially before subsequent Supreme Court opinions clarified that the fact that a person may reasonably believe he is no longer free to leave indicates only that a consensual encounter has evolved into a seizure implicating fourth amendment values and not that an "arrest" has occurred. *See Delgado* and *Mendenhall,* discussed *supra.* Our recent decisions are consistent with the rationals of other circuits we have presented. *E.g., United States v. Beardslee,* 609 F.2d 914 (8th Cir.1979) (no arrest in stop of moving car by use of siren and red lights), *cert. denied,* 444 U.S. 1090, 100 S.Ct. 1053, 62 L.Ed.2d 778 (1980); *United States v. Stout,* 599 F.2d 866, 868 (8th Cir.1979) (per curiam) (no arrest when vehicle stopped by police roadblock), *cert. denied,* 444 U.S. 877, 100 S.Ct. 163, 62 L.Ed.2d 106 (1979).

As to *Beck,* a Ninth Circuit car-blocking case, Jones simply fails to recognize the court's emphasis on the circumstances of the individual

case. The Ninth Circuit has twice since held that the blocking in by police of a suspect's car did *not* convert an investigative stop into an arrest. *United States v. O'Connor,* 658 F.2d 688, 692 (9th Cir.1981); *Patterson,* 648 F.2d at 633. The decision in *Beck* was based not just on the fact of blocking but also on the "overwhelming show of authority" in that the stop was carried out by nine officers in four cars, the lack of evasive conduct by the suspects, the absence of reason to believe that the suspects might be armed, and the lack of need for an immediate stop to "maintain the status quo" given that the officers had already conducted a four-day investigation. *Beck,* 598 F.2d at 501–02; *see Patterson,* 648 F.2d at 633. Furthermore, the court did not actually hold that the arrest occurred at the time of the blocking but instead said that "the arrest was complete * * * by the time each man was taken by two agents to separate locations, if not before." *Beck,* 598 F.2d at 502.

**7.** For example, see the Second Circuit cases decided after *Ceballos: United States v. Pelusio,* 725 F.2d 161, 166 (2d Cir.1983) (investigative stop); *United States v. Harley,* 682 F.2d 398 (2d Cir.1982) (investigative stop); and *United States v. Marin,* 669 F.2d 73, 81–82 (2d Cir.1982) (arrest).

tunity for them to have made the stop in less threatening circumstances.[8]

Applying these principles to the police encounter with Jones, we first note that officers Shrum and James had not been previously investigating Jones. They made an on-the-spot decision to detain him based on developing circumstances and a perceived need to maintain the status quo while determining if a burglary had been committed. *See Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. The encounter was not excessively "police dominated," as it involved only one police car and two officers. Jones according to testimony had run from the front of the apartment building upon seeing the officers with Brown,[9] and Jones was in the Volkswagen with the motor running when Shrum and James reached the rear of the apartment building. The potential danger to police in such a situation is illustrated by what happened when Shrum eventually reached in to unlock the car door.

While the officers upon initial approach had no reason to believe that Jones was armed or that the burglary, if one had indeed occurred, had involved armed persons, the circumstances facing the officers —i.e., pursuit of a suspected burglar and approach to a vehicle—in general present specific hazards, as statistics demonstrate.[10] Our reliance on such generalities is at odds with the approach in *Ceballos*, where it was stated that a display of weapons by police could not be justified by the fact that narcotics dealers as a rule frequently were armed, 654 F.2d at 184; however, we are struck by this statement of the D.C. Circuit in *White* where, in discussing local figures showing ten percent of the narcotics suspects arrested turned out to be armed, the court said, "[W]e feel the odds too high to require policemen to play 'russian roulette' each time they effect a drug arrest." 648 F.2d at 35 n. 29.[11]

Finally, although testimony is somewhat contradictory and the district court made no findings on this subject, the officers' guns apparently were only in and out during the confrontation. James testified that he drew his gun as a precaution only when Jones was out of sight down the gangway and that he reholstered the gun when he had Jones in sight again. Shrum similarly testified that he had reholstered his gun once he reached the car and began to question Jones. We must recognize some concern for officer safety. *Harley*, 682 F.2d at 402. We believe that, viewed through the eyes of a cautious and experienced police officer, the limited actions of

**8.** An additional factor might be the time and place of the stop. *E.g., United States v. Aldridge*, 719 F.2d 368, 372 (11th Cir.1983) (reasonable for officer patrolling alone to approach with gun drawn and order occupants out of the car when stopping vehicle containing three adult male suspects at 3 a.m.). This list of considerations is very similar to that offered by the Supreme Court in *Berkemer v. McCarty*, — U.S. —, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984), in discussing what constitutes custodial interrogation such that *Miranda* warnings must be given. The test for custodial interrogation formulated by the Court similarly is whether a suspect has been "subjected to restraints comparable to those of a formal arrest." *Id.* 104 S.Ct. at 3151.

**9.** Jones' testimony is that he saw no one as he was standing at the door of the apartment building and that he left at a normal pace when there was no answer to the buzzer. Shrum testified that Jones "walked rapidly" or "took off" while James testified that Jones "ran." We interpret the district court's findings as crediting James' version.

**10.** Over the ten-year period ending in 1983 sixty-five officers were feloniously killed while pursuing the perpetrators of burglaries and 106 were feloniously killed while investigating suspicious persons. Federal Bureau of Investigation, U.S. Dep't of Justice, *Law Enforcement Officers Killed and Assaulted*, 18 (Uniform Crime Report 1983). In addition, many more officers were assaulted—in 1983, for example, 1,090 while pursuing the perpetrators of burglaries and 4,954 while investigating suspicious persons or circumstances. *Id.* at 44. Figures for pursuits and stops of traffic violators, which would involve approaches to vehicles, show 129 officers feloniously killed in the ten-year period and 6,210 assaulted just in 1983. *Id.* at 18, 44.

**11.** The court in *White* held an approach with guns drawn consistent with an investigative stop even though the anonymous tip on which the officers had acted had not included information that the suspects might have been armed and the suspects in fact were not armed. 648 F.2d at 35.

Shrum and James in removing their guns from their holsters to make their weapons more accessible were reasonable precautions as they initially approached and evaluated the situation. *See White*, 648 F.2d at 36; *cf. United States v. Sharpe*, — U.S. —, —, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) (in assessing whether duration of an investigative stop was unreasonable, court should not "indulge in unrealistic second-guessing" of police action in a "swiftly developing situation"). These activities did not constitute an "arrest" of Jones.

### B.

Having concluded that the officers' initial approach to Jones was consistent under the circumstances with an investigative stop, we now must consider whether any of their further actions elevated Jones' detention into an arrest prior to time when Shrum saw the gun in the car (and thus had probable cause).[12]

■ Circuit courts in reliance on *Pennsylvania v. Mimms*, 434 U.S. 106, 109–11, 98 S.Ct. 330, 332–33, 54 L.Ed.2d 331 (1977), have stated that regardless of the circumstances under investigation it is not unreasonable for an officer to ask a suspect to step out of a vehicle. *E.g., United States v. Pelusio*, 725 F.2d 161, 166 (2d Cir.1983). There is less danger that an encounter will escalate if the questioning is conducted with the suspect outside the vehicle because there is less opportunity for use of hidden weapons and no chance that the suspect can suddenly try to drive away.[13] *White*, 648 F.2d at 37–38. In light of these concerns we cannot believe police are required to give up when the first request fails to elicit the desired action from a suspect. For example, in *White*, the D.C. Circuit found no arrest when, after three or four orders were ignored, the officer pointed a gun at the recalcitrant suspect as he again ordered him out of the car. 648 F.2d at 32, 37 n. 36. Similarly, we do not find an arrest occurred in our case when Shrum leaned in the rear passenger door of the Volkswagen and pointed his gun at Jones in a further attempt to get Jones out of the car. *See also United States v. Jacobs*, 715 F.2d 1343 (9th Cir.1983) (investigative stop of vehicle did not become an arrest when officer pointed his gun at the suspect and ordered her to "prone out"); *cf. Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (when suspect during investigative stop refused to get out of his car, officer acted reasonably in reaching through the window and seizing a gun he had grounds to believe would be present).

The issue of the officers' persistent requests that Jones identify himself[14] is slightly more complex given dicta by the Supreme Court suggesting that a person subject to an investigative stop may not be compelled to answer questions, *see Berkemer v. McCarty*, — U.S. —, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984); *Terry*, 392 U.S. at 34, 88 S.Ct. at 1886 (White, J., concurring), and the relationship of the right to remain silent to the fifth amendment guarantee against self-incrimination. *See Michigan v. DeFillippo*, 443 U.S. 31, 43–46, 99 S.Ct. 2627, 2635–2637, 61 L.Ed.2d 343 (1979) (Brennan, J., dissenting). Commentators, however, suggest a distinction between making refusal to answer in itself a crime and allowing silence, like evasive or inconsistent answers and answers known

---

12. The findings of the district court are clearly erroneous to the degree they imply that Shrum or James saw Jones' gun prior to the time when Shrum's arm became trapped in the car window. There was no testimony that either officer saw the gun prior to that point, and thus the gun's presence could not to any degree have justified the officers' questioning of Jones or their attempts to get him out of the car.

13. While 93% of the officers feloniously killed in 1983 fell victim to firearms, vehicles were the next most common weapon used fatally against police by suspects. FBI Uniform Crime Report, *supra*, at 3.

14. We are assuming that the district court rejected as not credible testimony by Jones that he handed his wallet through the window to the officers. The court does not make an express finding to this effect, but it omits this alleged incident from its affirmative narrative of events.

by the officers to be false, to be an element which, if accompanied by sufficient other circumstances, will give rise to the probable cause necessary to arrest a person already properly detained on reasonable articulable suspicion. *See* 1 W. LaFave, *Search and Seizure* § 3.6(f) (1978); *cf. United States v. Sadosky*, 732 F.2d 1388, 1392 (8th Cir.) (encounter no longer consensual but instead had risen to the level of an investigative stop when officers implied that suspect's failure to cooperate could lead to arrest), *cert. denied*, — U.S. —, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984).

Limits on the ability of an officer to ascertain the identity of a person would in many instances make investigative stops serve no useful purpose. To allow a suspect to refuse to provide identification would

> reduce the authority of the officer * * * recognized by the United States Supreme Court in *Adams v. Williams*, 407 U.S. 143 [92 S.Ct. 1921, 32 L.Ed.2d 612] * * * (1972), to identify a person lawfully stopped by him to a mere fiction. Unless the officer is given some recourse in the event his request for identification is refused, he will be forced to rely either upon the good will of the person he suspects or upon his ability to simply bluff that person into thinking that he actually does have some recourse.

*State v. Flynn*, 92 Wis.2d 427, 285 N.W.2d 710, 717–18 (1979) (officer making investigative stop could remove and make a limited search of wallet of suspect who refused to identify himself), *cert. denied*, 449 U.S. 846, 101 S.Ct. 130, 66 L.Ed.2d 55 (1980). If police during a stop near a crime scene are unable to obtain identification from a suspect, they likely will never be able to relocate the suspect should probable cause later develop. Studies, moreover, have shown the importance of on-the-spot apprehensions of suspects to the ultimate resolution of criminal investigations. 3 W. La-Fave, *supra*, § 9.4(g), at 94 & n. 183 (Supp. 1985).

 While we recognize that investigative stops must at some point end and that not all stops will end conclusively, we need not in this case draw the exact line where constitutional considerations compel officers to allow suspects to go free anonymously. We do not believe, in light of the concerns stated above, that an officer must be content with a single request for identification. The scope of an investigative detention is to be keyed to the purposes of the stop, with officers using "the least intrusive means reasonably available to verify or dispel [their] suspicion[s] in a short period of time." *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325. Officers Shrum and James did not act unreasonably in their attempts to learn Jones' identity. Jones thus, until the events prompted by his trapping of Shrum's arm in the car window and Shrum's observation of the gun in the Volkswagen, was subject only to an investigative stop.

## II.

 The minimal standard of articulable justification required by the fourth amendment for an investigative stop is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin*, 706 F.2d 263, 265 (8th Cir.1983); *see also Terry*, 392 U.S. at 21, 88 S.Ct. at 1879. A district court's determination as to the existence of sufficient justification is to be reviewed under the clearly erroneous standard. *Martin*, 706 F.2d at 265; *United States v. Wallraff*, 705 F.2d 980, 987 (8th Cir.1983).

 Reasonable articulable suspicion must exist as of the initial moment of seizure, but it is to be evaluated in light of the observations of the involved officers taken as a whole. *Wallraff*, 705 F.2d at 988. Acts which are innocent in and of themselves may take on more significance when considered together, *Terry*, 392 U.S. at 22–23, 88 S.Ct. at 1880–1881, and we may take into account any added meaning certain conduct might suggest to experienced officers trained in the arts of obser-

vation and crime detection and acquainted with operating modes of criminals. *Wallraff*, 705 F.2d at 988. It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, *id;* however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a very broad category of predominantly innocent persons. *See Reid v. Georgia*, 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980) (no reasonable suspicion from drug courier profile); *Brown v. Texas*, 443 U.S. 47, 51–52, 99 S.Ct. 2637, 2640–2641, 61 L.Ed.2d 357 (1979) (no reasonable suspicion from meeting between defendant and another man in alley in neighborhood frequented by drug users).

 In light of these principles we must now evaluate the circumstances as known to officers James and Shrum when they initially determined to stop Jones:

 1. Both had observed Brown, a known neighborhood burglar, leave the rear of an apartment building, look in their direction, and attempt to hide his face.

 2. Both had observed Jones at the front door of the same apartment building and had seen him look in their direction and run up the gangway.

 3. Detective James knew that burglars often worked in pairs, with one breaking in the back of a location and the other standing lookout at the front.

 4. A pat-down frisk of Brown, however, had not turned up a weapon or goods believed to be stolen.

 5. Three small children were in the Volkswagen that Jones entered.

We conclude that this information was sufficient to give officers Shrum and James, who had sixteen and six years of police experience respectively, reasonable articulable suspicion that Jones might have been working with Brown in an attempted burglary.

The officers' suspicions were first aroused when they observed Brown, a known burglar, and noted his furtive effort to hide his face. Jones' subsequent action in running from the front of the same apartment building upon seeing the officers, along with James' knowledge that burglars often worked in pairs, gave rise to full reasonable articulable suspicion. The officers were thus justified in determining if a burglary had occurred or possibly was about to occur. Under these circumstances, prompt action on their part was necessary. We realize that the basis for suspicion in this case was not as strong as in a number of the other cases decided in this circuit; nevertheless, the indications of criminal activity substantially exceeded those found insufficient to support reasonable articulable suspicion in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (apparent Mexican ancestry insufficient basis for stopping petitioner as suspected illegal alien), and *Brown v. Texas, supra.* We cannot conclude that it was other than good police work for Shrum and James to have further investigated what they considered to be a crime or potential crime unfolding before their eyes.

Finally, Jones argues that even if these facts at one point gave rise to reasonable articulable suspicion, that suspicion was dispelled before the officers' approach by the fruitless frisk of Brown and by the presence of the three children with Jones in the Volkswagen. *See Terry*, 392 U.S. at 28, 88 S.Ct. at 1883. In *United States v. Beardslee*, 609 F.2d 914, 918 (8th Cir.1979), *cert. denied*, 444 U.S. 1090, 100 S.Ct. 1053, 62 L.Ed.2d 778 (1980), however, we held that the police were entitled to stop the suspects' car even after receiving a report that no robbery had actually occurred. The failure to consummate a crime is not inconsistent with the existence of a conspiracy to have attempted that or other crimes. *Id.* In addition, it has hardly been a month since we decided a case in which a child was present in the car as his parents conducted drug transactions. *United States v. Clark*, 754 F.2d 789 (8th Cir.1985).

As we have concluded that Shrum and James were justified in stopping Jones and that their conduct of the detention was not excessive so as to rise to the level of an arrest, we uphold the district court's decisions allowing the gun and other items seized to be introduced into evidence. Jones' conviction is affirmed.