**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3793-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL KEE, a/k/a
MIKEY,

     Defendant-Appellant.

_____

Submitted January 13, 2021 – Decided April 26, 2021

Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-11-3227.

Joseph E. Krakora, Public Defender, attorney for appellant (Gilbert G. Miller, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Steven A. Yomtov, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Michael Kee appeals from his judgment of conviction, challenging the denial of his motions to suppress. We affirm.

On March 1, 2017, at about 8:00 p.m., defendant, Tymera Green, Troy Brown, and Brown's cousin left a home located at Fifth and Walnut Streets in Camden, New Jersey. The group was celebrating defendant's birthday. Before getting in the car, defendant told Green that he would be right back, then walked with Brown around the corner. Green and Brown's cousin got into defendant's silver Nissan Altima and waited. About five minutes later, Green heard a gunshot moments before defendant and Brown came back to the car with their hoods pulled over their heads.

Defendant got into the driver's seat, Brown got into the front passenger's seat, and Green and Brown's cousin remained in the back. When they returned, Green said the pair was frantic and defendant drove away at a high rate of speed. After making a few turns, defendant turned to Green, gave her a handgun, and instructed her to hold it. Green secured the gun under her shirt. The vehicle was headed south on Fourth Street when it passed officers James DiMarco, Kyle Cook, and Justin Widman of the Camden County Metro Police Department.

DiMarco, Cook, and Widman were standing near the intersection of Fourth and Mechanic Streets. Each officer testified they observed the silver

Nissan traveling south on Fourth Street at a high rate of speed. The speed limit in the area was twenty-five miles per hour. As the vehicle passed, the officers shined their flashlights on the pavement in front of it to signal the driver to slow down. The car continued at the same rate of speed. DiMarco advised Cook and Widman, who were conducting bicycle patrols, that he was going to stop the Nissan. While walking toward his patrol car, DiMarco noticed the Nissan's brake lights activate at the intersection of Fourth Street and Atlantic Avenue, before turning left onto Atlantic. Cook and Widman testified the Nissan failed to heed the stop sign at the intersection.

DiMarco, whose car was facing away from Fourth Street, proceeded down Mechanic Street, turned right onto Broadway, and right again onto Atlantic Avenue. Cook and Widman pursued the Nissan on their bicycles. They traveled south down Fourth Street then made a left onto Atlantic. As they turned onto Atlantic, Cook and Widman saw the Nissan stop and park on the side of the road. Cook testified that defendant attempted to exit the vehicle after he parked. DiMarco also saw the silver Nissan stop and park but was dispatched to a report of a nearby shooting before reaching the car. Cook and Widman approached on their bicycles and activated their body cameras as they initiated the stop.

3

At the suppression hearing, the State produced video footage of the traffic stop captured by Cook and Widman. The first thing that can be heard on the video is the dispatcher requesting available officers to respond to the area of Fourth and Mount Vernon Streets. Cook is shown standing on the driver's side as he directs defendant to exit the vehicle, walk to the back, and keep his hands on the top of the car. Cook asks "why are you driving so fast?" Defendant responds that his girl and his little nephew are in the back seat.

While Widman is standing next to the front passenger window with his flashlight trained on defendant's face, the following exchange occurred:

> WIDMAN: Where you guys comin' [sic] from man?
>
> DEFENDANT: What? Huh?
>
> WIDMAN: Where yous [sic] coming from? Where?
>
> COOK: Keep your hands on the car.
>
> DEFENDANT: We just come from Walnut Street.
>
> [DVD 1, Cook.]

Simultaneously, the following message can be heard over the radio:

> DISPATCH: Fourth and Mount Vernon. We got a report of a white Maxima, uh, crashed into another vehicle. The uh, suspect. Okay, correction. The victim was in the car. The white Maxima. Appears to be uh, one shot to the uh, the chest.

A-3793-18

WIDMAN:  Fifth and Walnut?

DEFENDANT:  Right there on the –

COOK: Yo, this, it's where they're coming from.

WIDMAN:  Huh?

COOK:  That's where they're coming from.

DEFENDANT:  It's not us though –

COOK: Keep your hands.  Where do you live?

DEFENDANT:  I live in Woodland.

COOK:  In Woodland?

DEFENDANT:  Yeah.  I got my name and (indiscernible) in the car.

COOK:  What's your name?

DEFENDANT:  My name Michael Kee.

[DVD 1, Cook; DVD 2, Widman.]

Cook directed defendant to sit on the curb then turned to Widman and said:

COOK:  This is where they're coming from.

WIDMAN:  Huh?

COOK:  That's where they're coming from, the shots fired.

5

DEFENDANT:  We just left from right there because they were shooting.  We was at my friend's house on Walnut Street.

COOK:  What were you doing over there?

DEFENDANT:  My brother live right there.  We were talking to my brother.  And when we heard shots we just pulled off, like, that shit scared us because they almost shot us.

[DVD 1, Cook; DVD 2, Widman.]

Cook also asked defendant for his address, with whom he resided, and his date of birth.  Defendant answered.  During that exchange, the following messages can be heard over the radio:

UNIDENTIFIED SPEAKER:  (Indiscernible)  one person shot in the chest.

UNIDENTIFIED SPEAKER:  Hispanic male, approximately (indiscernible) got at least one bullet wound to chest.  Uh, critical slash grave condition.

DISPATCH:  Ten-four.
UNIDENTIFIED SPEAKER:  (Indiscernible) younger black male in a green hooded sweatshirt.

UNIDENTIFIED SPEAKER:  You guys coming in?  I need that traffic blocked off at Fifth and Mount Vernon ASAP.

[DVD 1, Cook; DVD 2, Widman.]

A-3793-18

Brown, a young black male wearing a Philadelphia Eagles hoodie, matched the description that came over the radio. Widman responded:

> WIDMAN: Bravo-six-eight. We have a vehicle stopped. It's gonna [sic] be at Fourth and Atlantic. They were fleeing the area. They were coming from Fifth and Walnut they said. I have one individual in the passenger's seat with a green Eagles hoodie.
>
> [DVD 2, Widman.]

Defendant responded to the statement Widman made over the radio:

> DEFENDANT: That's where we live at.
>
> COOK: Stay there. Is there anything in the car?
>
> DEFENDANT: Sir ain't [sic] nothing in the car, but my information and everything in the kids (indiscernible).
>
> COOK: How many people are in the car?
>
> DEFENDANT: There's four people in the car. Me, the passenger, and two people in the back.
>
> WIDMAN: Where you guys going right now? Who lives on this block?
> BROWN: Nah, we just dropping my cousin off. Takin [sic] my little cousin.
>
> WIDMAN: Where?
>
> BROWN: Out in Centerville.
>
> WIDMAN: Centerville? This ain't [sic] Centerville.

A-3793-18

> BROWN: We comin [sic] from my mom's house. That's what I'm tellin [sic] you. That's what I said, we coming from my mom's house. That's what I told you.

[DVD 1, Cook; DVD 2, Widman.]

At this point, backup arrived. The remaining occupants were removed from the vehicle. Widman instructed Green to sit on the curb next to defendant. She testified that while seated, defendant warned her not to say anything to the police. Defendant told Green that she saw how easy it was for him to shoot someone and threatened to kill her if she told on him.

Each passenger was placed into a different police vehicle. Defendant had not been Mirandized.[1] Green was placed into the back of a patrol car, uncuffed, while her purse was placed in the front. The front of the vehicle was not accessible from the back. Green testified that after about five minutes, she removed the handgun from her shirt[2] and tucked it under the cushion of the backseat. She did not inform anyone about the gun. When asked why she hid the gun, Green responded "[b]ecause I didn't want anything to do with it. I didn't want to hold it."

---

[1] Miranda v. Ariz., 384 U.S. 436 (1966).
[2] The record is unclear as to how Green secreted the gun under her shirt.

A-3793-18

Green sat in the back of the patrol car for approximately twenty minutes before she was driven to a police station. She was not taken inside. Green remained in the patrol car for some time before she was driven to the prosecutor's office. At some point after leaving Atlantic Avenue but before reaching the prosecutor's office, Green's phone was taken from her and placed in the front of the patrol car where she could not access it. When she arrived at the prosecutor's office, Green continued to wait in the back of the vehicle for a period of time before she was eventually escorted inside and questioned for approximately two hours. While being questioned, Green allowed detectives to download several photographs from her phone. Green left the prosecutor's office at about 1:30 a.m.

The following morning, another officer was assigned the patrol car Green was placed in the night before. While performing a pre-shift inspection of the vehicle, he discovered the handgun underneath the back seat.

Defendant filed motions to suppress the roadside statements he made to the police on the night of his arrest, as well as the handgun. He argued his statements were taken while he was in custody and had not been given his Miranda warnings, therefore they must be suppressed. He also argued that the

police had no basis to conduct the traffic stop, and that the discovery of the handgun was the product Green's illegal detention.

Evidentiary hearings were held on January 2, 2019, and January 10, 2019. DiMarco, Cook, Widman, and Green testified on behalf of the State. Defendant did not call any witnesses. On February 7, 2019, the motion judge issued a written decision denying both motions.

The judge deemed the officers' testimony credible. He admitted defendant's roadside statements, finding they were not taken in violation of Miranda, but rather answers to appropriate questions associated with a routine traffic stop. Based on the time of day and defendant's attempted departure from the vehicle, the judge also found the instructions that were given and the limited questions that were asked were intended to secure the scene and collect biographical information. They were not intended to elicit incriminating statements.

The judge found the alleged traffic violations justified the traffic stop based on the officers' testimony. He also found defendant lacked standing to challenge admissibility of the gun because he relinquished his interest in the firearm by abandoning it, and that the exclusionary rule was inapplicable in this case.

A-3793-18

On February 7, 2019, pursuant to a plea agreement, defendant plead guilty to an amended count one, aggravated manslaughter, N.J.S.A. 2C:11-4(a). In return, the State recommended a term of thirteen years' imprisonment, subject to eighty-five percent parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2, followed by a five-year period of parole supervision. All other counts were dismissed. Under the plea agreement, defendant preserved his right to appeal the denial of the motion to suppress his roadside statements.[3] This appeal ensued.

Defendant raises the following points for our consideration:

> POINT I
>
> DEFENDANT'S STATEMENTS AT THE SCENE OF THE ROADSIDE STOP WERE THE PRODUCT OF UNWARNED CUSTODIAL INTERROGATION AND SHOULD HAVE BEEN SUPPRESSED.
>
> POINT II
>
> THE HANDGUN DISCOVERED BY THE POLICE UNDER THE REAR SEAT CUSHION OF THE PATROL CAR IN WHICH TYMERA GREEN HAD EARLIER BEEN LOCKED WAS SEIZED IN CONTRAVENTION OF GREEN'S RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND

---

[3] Defendant's right to appeal the denial of his motion to suppress physical evidence was automatically preserved. R. 3:5-7(d); see also State v. Greeley, 178 N.J. 38, 50-51 (2004) ("[O]nly motions for suppression on the grounds of unlawful search and seizure automatically survive the entry of a guilty plea.").

SEIZURES UNDER THE FEDERAL AND STATE CONSTITUTIONS. U.S. CONST. AMEND. IV; N.J. CONST. ART. I PAR. 7.

    A.    Standing

    B.    Green's Seizure and the Resultant Seizure of the Gun

    C.    Exclusionary Rule

I

Our review of the trial court's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). "An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425-26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). We do so "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.'" State v. Gamble, 218 N.J. 412, 424-25 (2014) (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "The governing principle, then, is that '[a] trial court's findings should be disturbed only if they are so clearly mistaken "that the interests of justice demand intervention and correction."'" Robinson, 200 N.J. at 15 (alteration in original) (quoting State v.

<u>Elders</u>, 192 N.J. 224, 244 (2007)). "We owe no deference, however, to conclusions of law made by trial courts in deciding suppression motions, which we instead review de novo." <u>State v. Brown</u>, 456 N.J. Super. 352, 358-59 (App. Div. 2018) (citing <u>State v. Watts</u>, 223 N.J. 503, 516 (2015)).

II

Defendant argues the statements he made to the police immediately after he was pulled over must be suppressed because the officers failed to use the least intrusive means necessary to carry out the traffic stop. Until the officers received the transmission about the gunshot victim, they had no basis to use such aggressive tactics. What should have been an innocuous traffic stop, defendant contends, was transformed into an unlawful arrest when he was ordered to get out of the vehicle, go to the back, and keep his hands on top of the car. By the time reasonable suspicion arose justifying limited questioning regarding the nearby shooting, defendant suggests he was already under arrest. Consequently, because he had not received his <u>Miranda</u> warnings, defendant argues the statements must be suppressed.

"General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" does not require <u>Miranda</u> warnings. <u>Miranda v. Ariz.</u>, 384 U.S. 436, 477 (1966). The United

A-3793-18

States Supreme Court, as well as our courts, have distinguished between detaining a citizen in the course of an investigatory stop, pursuant to Terry v. Ohio, 392 U.S. 1, 21-22 (1968), and placing a citizen in custody so as to trigger Miranda requirements. See Berkemer v. McCarty, 468 U.S. 420, 435-442 (1984); State v. Smith, 374 N.J. Super. 425, 432-35 (App. Div. 2005).

An investigatory stop is characterized by a detention in which the person approached by a police officer would not reasonably feel free to leave, even though the encounter falls short of a formal arrest. State v. Stovall, 170 N.J. 346, 355-56 (2002); see also Terry, 392 U.S. at 19. A police officer may lawfully conduct an investigatory traffic stop, without a warrant, based on a reasonable and articulable suspicion that the driver or any of its occupants have committed a traffic violation. State v. Dunbar, 229 N.J. 521, 532-33 (2017).

In this case, we see no error in the motion judge's denial of defendant's motion to suppress his roadside statements. Defendant argues he was placed into custody when the traffic stop was initiated because he was pulled out of the car and directed to stand near the back. Because he had not been given his Miranda warnings, defendant argues the entire interaction must be suppressed. However, "once a motor vehicle has been lawfully [detained] . . . the police officers may order the driver to get out of the vehicle without violating the

Fourth Amendment's proscription against unreasonable searches and seizures." State v. Smith, 134 N.J. 599, 611-12 (1994) (quoting Pa. v. Mimms, 434 U.S. 106, 111 n.6 (1977)).

At the suppression hearing, officers DiMarco, Cook, and Widman each testified they observed defendant's vehicle traveling at a high rate of speed down a street with a twenty-five mile per hour speed limit. Cook and Widman also testified that defendant failed to observe the stop sign at the intersection of Fourth and Atlantic and exited the car after parking. Under these circumstances, the officers' reasonable suspicion that defendant committed at least two traffic violations justified the investigatory stop and brief detention.

Once the traffic stop was initiated, the police were justified in asking "general on-the-scene question[s]" regarding the reason for the stop and were not required to provide Miranda warnings. Miranda, 384 U.S. at 477. "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." Berkemer, 468 U.S. at 439.

That is precisely what happened in this case. The officers conducted an investigatory detention during which they inquired who the driver was, where he was coming from, and why he was driving so fast. The questions were related

15

to the traffic violation that gave rise to the stop. As more information became available over the radio, it became apparent that defendant may have been involved in the nearby shooting. That also gave rise to a reasonable suspicion of illegal activity that justified a line of questioning more intrusive than what may be permitted during an ordinary traffic stop. A review of the record, however, reveals that the officers did not engage in such an interrogation. Rather, the officers removed the remaining occupants from the car and placed them in separate police vehicles. The interactions the officers had with defendant, and each other, were clearly intended to secure the scene and ensure officer safety.

Even if the officers had posed a limited number of questions intended to "confirm[] or dispel[]" their suspicion, Berkemer, 468 U.S. at 439, that defendant was involved in the shooting, caselaw suggests it would have been permissible. A court must consider the totality of the circumstances in determining whether an interrogation is custodial. State v. P.Z., 152 N.J. 86, 102 (1997). The content of the biographical questions, the amount of time spent in investigatory detention, and the evolving nature of the events of the traffic stop lead us to conclude defendant was not subjected to a custodial interrogation requiring Miranda warnings. Instead, the interaction represented a valid

investigatory detention justified by the circumstances. Accordingly, we affirm the motion judge's decision denying defendant's motion to suppress his roadside statements.

## III

Next, defendant argues the handgun was seized in contravention of Green's right to be free from unreasonable searches and seizures. He contends Green's prolonged detention, which began around 8:30 p.m. when she was placed in the back of a patrol car and ended around 1:30 a.m. when she was released from the prosecutor's office, constitutes a de facto arrest lacking probable cause. Because Green hid the gun while she was unlawfully detained, defendant argues New Jersey's constitutional protections prohibit it from being used against him. The motion judge admitted the handgun, finding that (1) defendant had abandoned the firearm by relinquishing it to Green; (2) Green was lawfully detained when she hid it; and (3) the purposes of the exclusionary rule would not be served by suppression.

## A.

In finding defendant had standing to assert violations of Green's constitutional rights, the motion judge relied primarily on State v. Bruns, 172 N.J. 40 (2002). In that case, the defendant sought to suppress evidence seized

from a vehicle that was subjected to a warrantless stop and search for reasons unrelated to the robbery the defendant allegedly committed. Bruns, 172 N.J. at 43. The defendant had no connection with the vehicle, but the evidence seized from it implicated him in the robbery. Id. at 44-45. The Court explained:

> In order to contest at trial the admission of evidence obtained by a search or seizure, a defendant must first demonstrate that he has standing. Generally speaking, that requires a court to inquire whether defendant has interests that are substantial enough to qualify him as a person aggrieved by the allegedly unlawful search and seizure. Jones v. United States, 362 U.S. 257, 261 (1960).
>
> [Id. at 46.]

The Court noted that Article I, Paragraph 7 of the New Jersey Constitution provides broader standing to challenge warrantless searches and seizures than under the Fourth Amendment of the United States Constitution. Id. at 50. In New Jersey, standing depends upon "whether that defendant has a proprietary, possessory or participatory interest in the place searched or items seized." Id. at 46 (citing State v. Alston, 88 N.J. 211, 228 (1981)). "[I]n most cases in which the police seize evidence implicating a defendant in a crime that defendant will be able to establish an interest in the property seized or place searched . . . ." Id. at 59. A participatory interest

18

> connotes some involvement in the underlying criminal conduct in which the seized evidence is used by the participants to carry out the unlawful activity . . . . It thus provides standing to a person who, challenging the seizure and prosecutorial use of incriminating evidence, had some culpable role, whether as a principal, conspirator, or accomplice, in a criminal activity that itself generated the evidence.
>
> [State v. Mollica, 114 N.J. 329, 339-40 (1989).]

However a defendant's basis for challenging the search will be diminished "[i]f substantial time passes between the crime and the seizure of the evidence, and a proprietary connection between defendant and the evidence no longer exists," or if "the search was not directed at the defendant or at someone who is connected to the crime for which he has been charged[.]" Bruns, 172 N.J. at 59. Because the defendant had abandoned the subject evidence a week earlier, was not present when it was found, and had no connection to the events leading to the challenged search, the Court found he did not have standing. Ibid.

Applying those principles, we agree with the motion judge that defendant has a participatory interest in the handgun. Defendant was a participant in the underlying criminal activity in which the seized evidence was used. Mollica, 114 N.J. at 339-40. In contrast to Bruns, in this case, the evidence was found the morning after it left defendant's possession, and he was directly connected

19

to the events that led to the gun's discovery. Therefore, we find defendant has standing to challenge its unlawful seizure.

B.

Defendant contends the motion judge erred in concluding Green's detention following the traffic stop was lawful. He suggests the police lacked probable cause to carry out the de facto arrest. Because the shooting occurred several blocks from Atlantic Avenue and Green was not identified as a suspect, defendant argues there was no justified cause to detain her. He reasons that if her seizure was unlawful, then the handgun is the result of unconstitutional police conduct, which, in turn, makes her abandonment the gun irrelevant.

Once a vehicle is stopped, "a police officer may inquire 'into matters unrelated to the justification for the traffic stop.'" Dunbar, 229 N.J. at 533 (quoting Ariz. v. Johnson, 555 U.S. 323, 333 (2009)). An officer may inspect the driver's license, determine whether there are any outstanding warrants against him or her, and check the vehicle's registration and proof of insurance. Ibid. (quoting Rodriguez v. United States, 575 U.S. 348, 355 (2015)). If, "the circumstances 'give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" Ibid. (alterations in original) (quoting State v. Dickey, 152 N.J. 468, 479-80 (1998)). "[A]n

20

investigative stop becomes a de facto arrest when '"the officers' conduct is more intrusive than necessary for an investigative stop."'"  Dickey, 152 N.J. at 478 (quoting United States v. Jones, 759 F.2d 633, 636 (8th Cir. 1985)).

A continued investigatory stop is lawful if it is "reasonable at its inception" and "the scope of the continued detention [is] reasonably related to the justification for the initial interference."  State v. Coles, 218 N.J. 322, 344 (2014).  There is no bright line test to determine the point at which a stop becomes a de facto arrest, but the Court has identified several guiding factors: unnecessary delay, fear and humiliation resulting from law enforcement's conduct, transportation of the detained person to another location, isolation of the person, or confinement of the person.  Dickey, 152 N.J. at 478-79 (quoting United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994)).  A de facto arrest is lawful only if supported by probable cause.  Id. at 478.

Property that is discarded while a person is unlawfully seized by the police is not considered abandoned.  State v. Tucker, 136 N.J. 158, 172 (1994).  Thus, when evidence is discovered as the result of an illegal seizure, that property is inadmissible.  Ibid.

Here, moments after the traffic stop was initiated, Cook and Widman received information about a shooting just a few blocks away from their

location.  Defendant advised the officers that there were two back seat passengers, and that he and the occupants of the Nissan had just departed the area where the shooting occurred.  The officers then learned that two young black males were involved in the shooting, one wearing a green hooded sweatshirt.  Defendant and Brown matched that description.

All the occupants were removed from the vehicle, including Green.  She was seated on a curb and then escorted to a police vehicle.  She was not handcuffed, but she was separated from her purse before being confined in the back of the patrol car.  She remained confined, and isolated from her companions, in the back seat of the police car for about thirty minutes before being transported.

The steps taken, until Green was transported to the police station, were not greater than necessary to address justified concerns for police safety, and the thirty minutes Green sat in the back of a patrol vehicle were directly related to securing the scene.  See State v. Mann, 203 N.J. 328, 338-39 (2010) (explaining reasonableness is examined objectively in light of the facts known to police at the time).  The officers had reliable evidence that someone in the vehicle may have been armed.  The separation and detention of the occupants were out of concern for the safety of all those present in light of the probability weapons

22

were in the vehicle.  See Terry, 392 U.S. at 25-26 (explaining officer safety is the foundation for a limited pat down for weapons when the officer had an articulable suspicion that a suspect may be armed).

Green hid the gun about five minutes after she was placed inside of the patrol car.  Accordingly, even if Green's detention turned into a de facto arrest as she waited in the back of the police car for several hours, she was lawfully detained when she hid the handgun.  Therefore, its discovery was not the product of illegal seizure requiring suppression of the gun.  Tucker, 136 N.J. at 172.  Rather, the weapon was found because Green abandoned the firearm during a lawful investigatory detention.

In hiding the gun, she met all of the elements required to demonstrate abandonment.  Green was in actual possession of the firearm, she knowingly and voluntarily relinquished it, and when it was discovered the following morning, there were no other apparent or known owners of the property.  Johnson, 193 N.J. at 549.  The initial traffic stop was lawful, and the subsequent investigatory detention was no greater than necessary to secure the firearm the officers believed to be in the vehicle.  Green was therefore lawfully detained while at the scene of the traffic stop.  In turn, since Green abandoned the gun while lawfully detained, we also find that law enforcement came into possession of

the firearm through a constitutionally sound sequence of events. Consequently, the exclusionary rule is inapplicable in this case. The handgun was properly admitted to evidence and defendant's motions to suppress were correctly denied.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION