UNITED STATES of America, Appellee,

v.

Joseph HARLEY, Defendant-Appellant.

No. 450, Docket 81–1290.

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1981.

Decided June 29, 1982.

 

Edward Chikofsky, New York City (David Breitbart, New York City, on the brief), for defendant-appellant.

James B. Rather, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., and Robert S. Litt, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before MOORE, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Joseph Harley appeals from a judgment of the United States District Court for the Southern District of New York convicting him of the possession of cocaine, 21 U.S.C. §§ 812, 844, and the receipt of a firearm as a convicted felon, 18 U.S.C. § 922(h). Harley contends that he was arrested without probable cause and that therefore District Judge Goettel erred in denying his motion to suppress evidence of the cocaine and firearm seized in the arrest. Finding no error, we affirm.

I

The events leading to defendant's arrest on January 11, 1981, occurred during an investigation by agents of the United States Drug Enforcement Administration. For several weeks prior to January 11, DEA agents had maintained periodic surveillance of a building located at 356 West 145th Street in Manhattan, where, they had been informed, narcotics transactions were taking place. On several occasions, agents observed suspicious behavior. There was an unusual amount of pedestrian traffic in and out of the building. Those who entered generally remained inside for only a few minutes, then came out and left the area. Sometimes, when two people arrived together, one would wait outside while the other went in. When the latter emerged, he would exchange something with the person who had remained outside, following which they would go their separate ways. This suspicious activity in a known high-crime area, coupled with informant infor-

mation that narcotics were being sold in the building, gave the agents reason to believe that narcotics transactions were, in fact, taking place.

On the night of January 11, the agents decided to question some of the people seen leaving the building, hoping thereby to obtain additional information and to uncover an informant who would be willing to take an agent inside. They decided to approach persons leaving the area by car rather than on foot, so that the contact would not be seen by persons inside the building. Around 8:30 p. m., a man arrived in a cab, which waited for him while he went into the building, and he then left in the same cab. The agents followed the cab until it stopped and discharged its passenger. Upon inquiry by the agents, the passenger confirmed the agents' belief that narcotics were being distributed in the building which, the passenger stated, was being used as a form of social club. Armed with this additional information, the agents resumed their surveillance.

At about 10:40 p. m., they saw the defendant drive up in a car bearing Georgia license plates. He double-parked, turned on the car's flashers and entered the building. A few minutes later, he emerged, reentered his car, and drove off. The agents followed. After proceeding several blocks, the defendant stopped for a red light near an entrance to the Harlem River Drive. The agents stopped alongside and slightly ahead of defendant's car, so that the right rear window of their car was even with the driver's window of defendant's car. Agent William Snipes, seated in the front passenger seat, motioned to the defendant to pull over, as Agent Gerald Franciosa, the driver, blew the horn. Agent Thomas Chamberlin, seated in the rear of the car, held up his badge to the window and also motioned Harley to pull over. Harley reacted by running the red light and racing up Harlem River Drive at speeds of up to ninety miles per hour.

The agents chased Harley for more than three miles, catching up with him only when he became boxed in behind two cars that were stopped at a red signal light. The agents then positioned their car so as to prevent Harley from again speeding away and got out of their car. As they did so, they observed Harley reach back into the floor area behind his seat. Agents Chamberlin and Franciosa drew their guns, but remained in the background while Agent Snipes, whose gun remained holstered, approached Harley, opened his door and directed him to get out of the car. As Harley got out, Agent Chamberlin reholstered his gun and took Harley around to the rear of the car. At the same time, Agent Snipes observed a handgun on the floor of Harley's car behind the front seat. He picked it up and told Chamberlin that he had recovered a weapon, whereupon Chamberlin placed Harley under arrest. Following the arrest, Chamberlin searched Harley and recovered a packet of cocaine from the front pocket of Harley's jacket.

In denying Harley's suppression motion, Judge Goettel held that Harley was not arrested until after Agent Snipes recovered the handgun and that the events which preceded the arrest were reasonable under the circumstances.

II

In recent years, following the leadership of the Supreme Court, we have explored at some length the limitations which the Fourth Amendment places upon the warrantless accosting of individuals by law enforcement officers. *See, e.g., Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Streifel*, 665 F.2d 414 (2d Cir. 1981); *United States v. Ceballos*, 654 F.2d 177 (2d Cir. 1981); *United States v. Jackson*, 652 F.2d 244 (2d Cir.), *cert. denied*, 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981); *United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981). The pertinent holding of these cases, as summarized by Judge Kearse in *United States v. Streifel, supra*, 665 F.2d at 422, is that an officer

having a reasonable suspicion, based on articulable, objective facts, that criminal activity is afoot may make an investigatory stop that is reasonable in both its duration and its intrusiveness. We agree with the district court that the stop in the instant case did not exceed these bounds.

By the time defendant visited 356 West 145th Street, the DEA agents were pretty well convinced that narcotics were being sold on the premises. The characteristics of Harley's brief stop were typical of the activities which the agents had been observing. Although Judge Goettel did not base his holding upon a finding of probable cause, he suggested the possibility that the DEA agents had probable cause to arrest Harley when they first accosted him. Whether or not the facts then in the agents' possession were adequate to constitute probable cause, they clearly were sufficient, when coupled with Harley's precipitous and reckless flight, to justify an investigatory stop.

From the very infancy of criminal litigation, juries have been permitted to consider flight as "evidence of consciousness of guilt and thus of guilt itself." 2 Wigmore, *Evidence*, § 276(4), at 122 (Chadbourn rev. 1979); *Harrington v. Sharff*, 305 F.2d 333, 338 (2d Cir. 1962). Such evidence surely may be considered as meaningful by police officers contemplating only a stop or an arrest, where the controlling standard is something less than "beyond a reasonable doubt". *People v. Kreichman*, 37 N.Y.2d 693, 699, 376 N.Y.S.2d 497, 339 N.E.2d 182 (1975). "[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest." *Sibron v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968); *see Husty v. United States*, 282 U.S. 694, 700–01, 51 S.Ct. 240, 241, 75 L.Ed. 629 (1931); *United States v.*

*Gomez*, 633 F.2d 999, 1007 (2d Cir. 1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *United States v. Maslanka*, 501 F.2d 208, 212–13 (5th Cir. 1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975); *People v. Kreichman, supra*, 37 N.Y.2d at 698–99, 376 N.Y.S.2d 497, 339 N.E.2d 182.

Relying principally upon this Court's decision in *United States v. Ceballos, supra*, 654 F.2d 177, defendant argues that his detention by the agents was not an investigatory stop but that, instead, he was under arrest from the time he made the second stop. We think that defendant extracts more from the *Ceballos* opinion than Judge Sand put into it.[1] In *Ceballos*, at least three vehicles manned by officers were used to effect the stop of defendant's vehicle, one blocking the front and two blocking the rear. At least some of the officers in these vehicles then approached defendant's car with weapons drawn. *Id.* at 180. The Court held that this use of force was not precipitated by any actions of the defendant who, the Court said, drove in a normal manner and gave the officers no reason to suspect that he was armed. *Id.* at 183–84. The Court did not hold that a law enforcement officer is precluded from displaying a weapon unless he has probable cause to make an arrest. Indeed, Judge Sand cited numerous cases in which the display of weapons was held not to transform a stop into an arrest. *Id.* at 183 n.10. It would be a sad day for law enforcement officers if a *per se* rule to the contrary were now adopted.

During 1980, one hundred four police officers were killed in the line of duty, ninety-five of them by means of a gun. Federal Bureau of Investigation, *Uniform Crime Reports for the United States, 1980*, at 338–39 (1981). Thirty were killed while investigating robberies and burglaries in progress or while pursuing the perpetrators. *Id.* Eighteen were killed while attempting arrests for other crimes. *Id.* Seventeen were killed while investigating suspicious persons

---

1. *United States v. Ceballos* was written by District Judge Sand, sitting by designation, with the concurrence of Judge Oakes and over a strong dissent by Judge Meskill.

or circumstances. *Id.* Seventeen were killed during traffic pursuit or stops. *Id.* Unless we wish these already tragic figures to escalate, we must give law enforcement officers a reasonable opportunity to protect themselves. Nothing in the Constitution requires that we do otherwise. *United States v. Jackson, supra,* 652 F.2d at 248–50; *United States v. Maslanka, supra,* 501 F.2d at 213 n.10.

█ In short, there is no hard and fast rule concerning the display of weapons. *Terry*[2] stops are narrow but fluid exceptions to the warrant and probable cause requirements of the Fourth Amendment. What might be unreasonable when an officer merely suspects that a minor offense has been committed is not unreasonable when, as here, officers have reason to fear that a suspected criminal is armed. The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness. *See, e.g., United States v. Bull,* 565 F.2d 869, 870 (4th Cir. 1977), *cert. denied,* 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978).

█ If there is sufficient reasonable suspicion to justify an investigatory stop, reasonable force may be used to effect that stop. *United States v. Streifel, supra,* 665 F.2d at 422. In weighing the conduct of the officers involved, we must give due consideration to their experienced judgment. *United States v. White,* 648 F.2d 29, 36 (D.C.Cir.), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed. 233 (1981). We would be heartless if we did not share the officers' concern for their own safety. As Judge Meskill aptly stated, we cannot impose on law enforcement personnel the hobson's choice of keeping their guns holstered when to do so "increases the risk that [they] will be shot." *United States v. Jackson, supra,* 652 F.2d at 249.

The testimony in the instant case shows that Agents Chamberlin and Franciosa, who drew their weapons, remained in the back-

ground, and there is no proof that the defendant even saw the unholstered weapons. In view of the nature of the criminal activity under investigation, the likelihood of defendant's involvement, his precipitous and dangerous flight, and his unusual conduct in reaching into the back seat of his car as the agents approached, the district court did not err in refusing to elevate defendant's preliminary investigatory detention into an arrest. *United States v. White, supra,* 648 F.2d at 39–46.

The judgment of the district court is affirmed.

---

2.  *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).