**UNITED STATES of America,**

v.

**William HERNANDEZ, Defendant.**

**No. 02 CR. 0152(NRB).**

United States District Court,
S.D. New York.

Sept. 6, 2002.

John F. Curley, Fed. Defenders Services Unite, New York City, for defendant.

## MEMORANDUM & ORDER

BUCHWALD, District Judge.

Defendant William Hernandez and his co-defendant Enmanuel Hernandez were arrested on December 11, 2001, and charged with conspiracy to distribute, and distribution and possession with intent to distribute, approximately 15 kilograms of cocaine as well as 1200 grams of cocaine base, a substance commonly known as "crack". 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846. In motion papers filed with the Court on March 13 and 15, 2002, defendants moved for the suppression of the narcotics, claiming that the seizure of the narcotics at issue violated their Fourth Amendment rights. Suppression hearings were held on May 6, 2002, and May 22, 2002. At the May 22 hearing, defendant Enmanuel Hernandez withdrew his motion to suppress, but the hearing continued as with respect to defendant William Hernandez. Having considered the evidence received at the May 22, 2002, suppression hearing and the post-hearing briefs submitted in connection with William Hernandéz's motion, defendant William Hernandez's motion is denied.

### *Background*

At the suppression hearing held on May 22, 2002, the Government presented the testimony of Special Agents Patrick Bagley ("Agent Bagley") and Thomas Daly ("Agent Daly") of the Drug Enforcement Administration ("DEA"). The facts, as found by this Court, are as follows.[1] The investigation that led to the apprehension

---

1. All facts are drawn from the testimony given at the suppression hearing of May 22, 2002, hereinafter cited as "Hrg. Tr.," as well as the brief affidavit submitted by William Hernandez in support of his motion.

of defendants Enmanuel Hernandez and William Hernandez stemmed from information provided by a confidential informant concerning the narcotics trafficking activities of Enmanuel Hernandez. This confidential informant had been the source of information in a few prior investigations and had always given reliable information. *See* Hrg. Tr. at 40–42. In fact, the information provided by the confidential informant had enabled the agents to make arrests and seize narcotics on several prior occasions. *Id.* In this case, the informant had reported that Enmanuel Hernandez was involved in the trafficking of large amounts of cocaine and that 136 Allen Street, Manhattan was being used as a location to store narcotics by Enmanuel Hernandez and other people connected with Enmanuel Hernandez's drug activities. *Id.* at 40–45, 139–40, 142–43. Additionally, the confidential informant reported that Enmanuel Hernandez sometimes carried a firearm. *Id.* The agents had already confirmed the confidential informant's information concerning Enmanuel Hernandez's address and vehicle, and as the investigation of Enmanuel Hernandez continued, the confidential informant's information had been increasing in specificity. *See id.* at 44–45.

On December 11, 2001, the day of the arrest, Agents Bagley and Daly were conducting surveillance on 136 Allen Street with a third DEA agent, Christopher Balchon ("Agent Balchon"). At about 5:30 p.m., Agent Daly saw Enmanuel Hernandez walk down the street with two individuals he did not recognize,[2] and enter a restaurant at the corner of Allen and Rivington Streets. *Id.* at 48, 145. About half an hour later, Agent Daly observed Enmanuel Hernandez leave the restaurant with the same two individuals and get into

a gold Toyota Camry. *See id.* at 48–49, 143. The agents established surveillance on the car until it got onto the FDR Drive heading northbound, and then they returned to 136 Allen Street to continue their surveillance of the building. *Id.* at 50–51, 146. Then, at about 6:30 p.m., Agent Bagley observed that Enmanuel Hernandez had returned to the area, and saw him park the gold Camry in front of 136 Allen Street. *Id.* at 51–54. Shortly thereafter, another individual who was later identified as William Hernandez exited the building carrying a large duffel bag and a shopping bag, both of which appeared to be heavily weighted. *Id.* at 53–55, 99–101. William Hernandez walked to the gold Camry, opened the rear passenger-side door, placed the bags into the car, and closed the door. He then got into the passenger seat of the Camry and the car pulled away with the two defendants inside. *Id.* at 55, 102.

After making several turns and proceeding a number of blocks, the Camry pulled over to the curb and William Hernandez exited the vehicle and began walking over to a pay phone on the sidewalk. *Id.* at 56–58. At this point, Agent Bagley, who was in the vehicle immediately following the gold Camry, pulled up directly behind the defendants' car, put his red light in the window of his vehicle, and exited his car. *Id.* at 58–60. Agent Bagley carried a flashlight and his fanny pack, which contained his weapon, thrown over his shoulder. *Id.* Speaking only to William Hernandez, Agent Bagley approached William Hernandez on the sidewalk while showing William Hernandez his badge, identified himself as a police officer, and asked the defendant to come over to him. At first William Hernandez responded only by

---

**2.** Agent Daly did recognize Enmanuel Hernandez, who he had seen during prior surveillance.

speaking to Agent Bagley in Spanish, which Agent Bagley does not speak, but in response to Agent Bagley's motioning to William Hernandez to come towards him, he eventually followed Agent Bagley's instruction to approach. Agent Bagley then guided William Hernandez to the area in the rear of the Camry. *Id.* at 58–60. Agent Bagley estimates that this entire exchange took less than one minute. *Id.* at 60. Further, Agent Bagley testified that he did not display his weapon at any time and he did not see whether Agents Daly and Balchon had their weapons drawn during this time. *Id.* at 107.

A short while after Agent Bagley left his vehicle, Agent Daly had pulled up to the left of the gold Camry and had exited his vehicle. Standing in the street and on the other side of the gold Camry, Agent Daly observed the interchange between William Hernandez and Agent Bagley. *Id.* at 147–48. Observing that William Hernandez had his hands in his pockets, he pointed his weapon towards William Hernandez, directing him to remove his hands from his pockets. *Id.* As soon as William Hernandez removed his hands from his pockets, Agent Daly turned his attention towards the driver Enmanuel Hernandez, who was still seated in the driver's seat of the gold Camry. *Id.* at 148. Once Enmanuel Hernandez raised his hands into view, Agent Daly holstered his weapon and, assisted by Agent Balchon, escorted Enmanuel Hernandez to the rear of the vehicle. *Id.* Agent Daly testified that although he recalled that Agent Balchon's weapon was out at some point, he did not remember when it was reholstered. *Id.* at 149.

While they were standing at the rear of the gold Camry, both Enmanuel Hernandez and William Hernandez were patted down for weapons. During this time, Agent Bagley used his flashlight to look through the tinted windows of the car to make sure that there were no passengers inside. *Id.* at 62–67. Through the back passenger-side window, he observed the large duffel bag on the back seat, and saw that the shopping bag previously placed in the car by William Hernandez had tipped over a bit towards the passenger side window. *Id.* Some of the clothes that were placed on top of the shopping bag had partially spilled out and the contents of the shopping bag were showing. Namely, Agent Bagley observed two clear plastic bags wrapped partly in duct tape that seemed to contain a "white, powdery rock-type substance." *Id.* at 63–64. Having previously observed this sort of packaging in narcotics cases, Agent Bagley came to the conclusion that the bags contained cocaine and he called over Agent Daly. *Id.* at 65. After Agent Daly took a look through the window, the agents opened the car door and confirmed their initial conclusion that the plastic bags contained narcotics. The defendants were handcuffed and arrested as the agents called for backup and inventoried the contents of the two bags in the backseat, which were filled with narcotics and narcotics paraphernalia such as a scale and duct tape. In addition to the drugs, the agents also recovered keys that fit one of the locks to an apartment door at 136 Allen Street, personal papers, a beeper, and a cell phone. *Id.* at 68.

### Discussion

Defendant William Hernandez advances two types of arguments in support of his motion to suppress the physical evidence recovered on December 11. The first of these arguments is factual in nature. Hernandez attacks the credibility of the Government's witnesses, Agents Daly and Bagley, and characterizes their accounts of the events leading to defendant's arrest as inconsistent and unbelievable. Specifically, defendant argues that "th[e] entire scenario [as told by the agents] smacks of being fabricated to justify an unconstitutional search of the bags." Deft.'s Post–

Hrg. Mem. of Law at 8. Having had a full opportunity to listen to and observe the demeanor of the agents at the May 22 hearing, and having found the testimony of the agents to be both consistent and forthright, I reject defendant's position that the testimony adduced at the suppression hearing was fabricated to justify an unlawful search.

Second, defendant makes the legal argument that the agents did not possess objective and articulable facts to support a reasonable belief that the occupants of the gold Camry were engaging in criminal activity, and that the agent's stop of William Hernandez was therefore unconstitutional. Additionally, defendant argues that because Agents Daly and Balchon drew their weapons during the encounter, the agents converted a *Terry*-stop into an unlawful arrest, lacking in probable cause. Thus, we must both determine whether facts known to the agents prior to the investigative stop of the defendant on December 11 amounted to reasonable suspicion, and whether the defendant was "subjected to such a degree of force that the stop was in fact an arrest governed by the requirement of probable cause." *United States v. Ceballos,* 654 F.2d 177, 181 (2d Cir.1981).

■ To determine whether an investigative stop is reasonable under the Fourth Amendment, we examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Alexander,* 907 F.2d 269, 272 (2d Cir.1990) (quoting *Terry* ). "Whether or not this standard of reasonableness is met depends principally on two factors: the basis for the stop and the degree to which the stop restrains the individual." *United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir.1980). This first factor requires that the law en-

forcement officers be " 'aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that the individual was engaged in criminal activity." *Vasquez,* 638 F.2d at 520 (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). The second factor calls for an examination of the degree of the intrusion into the individual's freedom; "[t]he greater the intrusion, the stronger the basis for the [agents'] action must be." *Id.*

■ In this case, there can be no doubt that by an objective standard, the agents who stopped William Hernandez and his co-defendant were aware of substantial and articulable facts warranting a powerful, reasonable suspicion that the defendants were engaging in narcotics trafficking activities. The agents had received information from a confidential informant, who had previously proven to be reliable and whose information had been partially verified, that Enmanuel Hernandez was trafficking in large amounts of cocaine. Further, the agents were aware that Enmanuel Hernandez was associated with other individuals engaging in drug activity, and that an apartment at 136 Allen Street was being used as a "stash house" by these persons. Then, during surveillance of 136 Allen Street, the agents observed Enmanuel Hernandez, who they knew resided outside of Manhattan and who regularly drove a different car than the gold Camry, meeting with two men in the vicinity of 136 Allen Street. They saw Enmanuel Hernandez leave the area and then return shortly later to the street and pull up in front of 136 Allen Street. At this time, they observed William Hernandez leave 136 Allen Street holding two heavily weighted bags. Based on the experience of a seasoned DEA agent, it was objectively reasonable for the agents to have concluded that they were observing a prearranged narcotics transaction.

With respect to the second factor, we further find that the degree of intrusiveness of the stop was reasonable given the circumstances. It is true, as defendant argues, that the drawing of weapons is a hallmark indication of an arrest and therefore "is an intrusion that calls for careful scrutiny" in the context of an investigative stop. *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir.1984). However, "there is no hard and fast rule concerning the display of weapons." *United States v. Harley*, 682 F.2d 398, 402 (2d Cir.1982); *see, e.g., Alexander*, 907 F.2d at 272–73 (holding that drawing of weapons did not convert stop into an arrest); *United States v. Vega*, 72 F.3d 507 (7th Cir.1995) (same); *see also Ceballos*, 654 F.2d at 184 n. 10 (surveying cases in which drawing of weapons did not convert stop into an arrest given the reasonableness under the circumstances). In determining whether the degree of restraint used was more intrusive than that permitted in an investigative stop, the Second Circuit has employed a highly fact-specific inquiry, considering such factors as: the amount of force used by the officers, the need for such force, the extent to which the individual's freedom of movement was restrained, the number of agents involved, whether the target was suspected of being armed, the duration of the stop, and the physical treatment of the suspects (including whether handcuffs were used). *United States v. Perea*, 986 F.2d 633, 645 (2d Cir.1993); *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir.1995) (citing *Perea* for these considerations); *United States v. Campbell*, 959 F.Supp. 606, 611 (W.D.N.Y. 1997) (same).

■ Applying these factors to this case, we find that Agents Daly and Balchon were justified in drawing their weapons given the circumstances, and that their actions did not convert the stop into a *de facto* arrest. William Hernandez had already exited the gold Camry and was walking over to a public phone when Agent Bagley pulled his vehicle up and exited, calling William Hernandez towards him on the sidewalk. "It is significant that [Agent Bagley], who actually approached [the defendant], did *not* remove his revolver." *Nargi*, 732 F.2d at 1107. Pulling up shortly thereafter and observing that William Hernandez had his hands in his pockets, Agent Daly did unholster his weapon while directing William Hernandez to remove his hands from his pockets. However, Agent Daly was on the opposite side of the Camry, standing in the street, while William Hernandez stood on the sidewalk attempting to communicate in Spanish with Agent Bagley. There is no proof that William Hernandez even saw the unholstered weapon.[3] *Harley*, 682 F.2d at 402 (noting that the defendant may not even have seen the weapons of the officers who remained in the background during the stop). In fact, Agent Bagley testified that he was not aware that Agent Daly had withdrawn his weapon and that he believed that during the time he was speaking with William

**3.** It is entirely possible that William Hernandez may not have realized that Agent Daly had drawn his weapon and also may not have understood that Agent Daly's directions to remove his hands from his pockets, which were in a language foreign to the defendant, were addressed to him. The only factual information provided by defendant William Hernandez on the conditions of the stop is contained in his affidavit, dated March 6, 2002. Hernandez states only that as he exited the gold Camry, he was "forcibly detained" by the officers who had been following him. William Hernandez Aff. ¶ 5. Defendant makes no reference to a display of weapons, and, in fact, at the May 22 hearing, his counsel was surprised to learn that weapons had been drawn. *See* Hrg. Tr. at 136 to 137 (responding to the Government's offer to stipulate that two agents unholstered their weapons by stating, "They did have their weapons drawn?").

Hernandez, Agent Daly had exclusively occupied himself with helping Agent Balchon remove Enmanuel Hernandez from the driver's seat of the Camry.

Further, the brief unholstering of the weapons of Agents Daly and Balchon was warranted. The investigative stop occurred during the evening, when it was already dark outside. The suspected crime was a serious felony, and it is well-recognized in this Circuit that weapons are often used by persons engaged in narcotics trafficking. *Nargi*, 732 F.2d at 1106. Significantly, the agents had information from their confidential source that Enmanuel Hernandez sometimes carried a firearm. *Harley*, 682 F.2d at 402 ("What might be reasonable when an officer merely suspects that a minor offense has been committed is not unreasonable when, as here, officers have reason to fear that a suspected criminal is armed.") Additionally, because Enmanuel Hernandez was in the car and William Hernandez had his hands in his pockets, the agents' concern that the defendants might be reaching for their own weapons is both rational and prudent. Moreover, as soon as the agents could see the hands of the defendants, they holstered their weapons. The defendants were far from outnumbered by law enforcement officers; only three DEA agents were present during the stop of the two defendants. Although the defendants were frisked quickly for weapons, they were not handcuffed until after their arrest. In short, although weapons were briefly displayed during the stop, the agents' actions were fully justified by their rational concern for their own safety given the information they had and the circumstances of the stop.[4] Further, the defendants were detained for less than a minute before the agents saw the cocaine on the back seat of the Camry, which indisputably established probable cause to arrest the defendants.[5]

Having weighed the extent of the intrusion on the rights of the defendant and the reason for the restraint, we find the investigative stop of William Hernandez to have been reasonable. Accordingly, defendant's motion to suppress the evidence seized at the time of his arrest is denied.

### Conclusion

For the foregoing reasons, defendant's motion to suppress is denied. A conference is scheduled in this case for September 18, 2002, at 10:30 a.m.

**SO ORDERED.**

---

4. It is well-established in this Circuit that "in weighing the conduct of the officers involved, we must give due consideration to their experienced judgment." *Harley*, 682 F.2d at 402. Moreover, it would be unwise to adopt a legal rule that would discourage law enforcement officers in like situations from drawing their weapons as needed to protect their safety. *Id.* at 401 ("It would be a sad day for law enforcement officers if a per se rule [that the display of weapons transforms a stop into an arrest] were now adopted."). "A law enforcement officer, faced with the possibility of danger, has a right to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *United States v. Alex-*

ander, 907 F.2d 269, 272 (2d Cir.1990) (citing *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

5. The Government did not argue, and we need not reach, whether probable cause for the arrest was established earlier than the moment the agents saw the narcotics on the seat of the Camry. However, we note that had the Government produced the testimony of the confidential informant, there is a strong possibility that the Government could have established probable cause to arrest based on the information supplied to the DEA agents through their source in addition to the events that were observed during the agents' surveillance.