# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>October 13, 2015</u>

**NO. 33,156**

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

v.

**OSCAR HERNANDEZ**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Darren M. Kugler, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
M. Anne Kelly, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Tania Shahani, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**SUTIN, Judge.**

**I.     Introduction**

{1}     Defendant Oscar Hernandez challenges the district court's denial of his motion to suppress contraband seized from him and statements he made during an investigatory stop of an SUV in which he was a passenger. He asserts that law enforcement agents did not have reasonable suspicion when they stopped the SUV. We hold that the stop was supported by reasonable suspicion, and we affirm the district court.

**Procedural History**

{2}     Following his arraignment for possession of a controlled substance, in violation of NMSA 1978, Section 30-31-23(E) (2011), Defendant filed a motion to suppress the controlled substances seized, as well as all statements made by him, following an August 23, 2012, stop of an SUV in which he was a passenger. The district court held an evidentiary hearing on the motion during which the State proffered testimony from the two undercover agents concerning events preceding the stop of the SUV.

{3}     The district court denied Defendant's motion to suppress, listing the following factors that were considered in its totality of the circumstances analysis.

> (1) the established drug house through undercover buys, (2) previous identification of the SUV through an undercover buy at [a] separate drug house, (3) observation of activities consistent with previous drug buys which included the dropping off and picking up of the male passengers, and (4) the [three to five] minute time frame that was found to be consistent with drug trafficking.

Following the denial of Defendant's motion to reconsider, Defendant entered a conditional plea, reserving his right to appeal the district court's denial of his motion to suppress. Judgment was entered against Defendant, and Defendant filed a timely notice of appeal.

## II.  Background

{4}  This case involved an ongoing narcotics investigation that culminated in the stop of the SUV and the arrest of Defendant, who was a passenger in the vehicle. Following the stop, Defendant was described by another passenger in response to an agent's query about the location of the narcotics. The stop was based on three previous incidents occurring in the agents' ongoing investigation, incidents that the State maintains supported reasonable suspicion for the stop of the SUV. We describe those incidents.

### A.  July 3, 2012

{5}  Undercover narcotics Agents Gabriel Arenibas and Joseph Misquez arranged an undercover heroin buy on July 3, 2012, through a man named Kyle Mendenhall. The agents referred to Mendenhall as a "suspect" and used him not as a confidential informant, but rather as a source of drugs and a way to track down other heroin dealers in the area.[1] The agents drove with Mendenhall to the Oñate Greens Trailer

---

[1] Our impression that Mendenhall was not a confidential informant and was unaware of the agents' positions with law enforcement is enhanced by the fact that no mention appears in the record of the agents conducting controlled buys, where the informant is first checked to see if they possess drugs prior to making the buy at the request of officers, *see State v. Lujan*, 1998-NMCA-032, ¶ 2, 124 N.M. 494, 953 P.2d

Park. Mendenhall directed the agents toward a trailer in Space 104 in the trailer park. He requested that the agents drop him off a few spaces away so that he could approach on foot, as the resident of Space 104 did not like new people to go there. The agents parked a few spaces away from Space 104, moved to a vantage point where they could observe Mendenhall, and saw him go into the white trailer. Mendenhall remained in the trailer for two to five minutes, returned to the car, they proceeded to Mendenhall's residence to drop him off, and Mendenhall gave a packet of heroin to the agents. Both agents testified that Mendenhall's presence in the trailer for two to five minutes was consistent with drug trafficking.

**B.      July 23, 2012**

{6}      Sometime after the July 3 buy, Mendenhall violated his parole, and the agents were no longer able to make buys through him. The agents accepted an offer from Brandon Hall and Zach Malchete, who were relatives of Mendenhall, "to hook us up meaning to sell us heroin" and arranged to buy heroin from them instead of Mendenhall.[2] On July 23, 2012, Hall and Malchete met with Agent Misquez, while Agent Arenibas conducted surveillance from approximately twenty feet away. Agent

---

29 (describing a typical controlled buy), and the fact that his role in the investigation ended due to an unrelated parole violation.

      [2] It appears from the record that the agents' interactions with Hall and Malchete were not controlled buys and that Hall and Malchete were also not confidential informants. This position is based on repeated references to "undercover buys" with Hall and Malchete, references to them as "suspects," and the fact that Agent Arenibas remained with Agent Misquez during the July 23 buy for "safety."

Misquez gave Malchete $40 to purchase the heroin, and Malchete left, stating that he had to go to the Oñate Greens to his "connect." Agent Misquez testified that Malchete, Hall, Mendenhall, and several other subjects were part of the investigation that the agents were working, and they knew their sources to be at two locations, one of which was Space 104 in the Oñate Greens Trailer Park. Agent Misquez confirmed that Malchete stated that he was "going to that white trailer," and Hall also confirmed the same information to Agent Misquez, that it was the white trailer in Space 104 from which Mendenhall had purchased heroin on July 3. Malchete returned approximately five to ten minutes later; upon his return, Malchete gave Agent Misquez $40 worth of heroin.

**C.      August 10, 2012**

{7}      On August 10, 2012, the agents contacted Hall in order to purchase more heroin; Hall did not have the amount that the agents requested, but offered to get it if they agreed to drive him to a location where he could purchase it. The agents agreed, and Hall directed them to 2801 Merriweather Street. This buy played out under the "same circumstances" as the July 3 purchase by Mendenhall at Space 104, in that the agents parked down the street from the house and waited while Hall went into the Merriweather home on foot; again, the reason for this was that the individual at the Merriweather home disliked new people coming to the house. While Hall was in the house, the agents noticed a tan or golden colored SUV parked in the driveway of the Merriweather home and "got the plate" of that vehicle. Hall came out of the residence three to five minutes later, got into the agents' car, and handed Agent

4

Misquez a small amount of heroin. At the time, the agents did not know who resided at 2801 Merriweather. The agents later determined that a family lived at the residence and that the SUV was registered to a person living at that address.

**D.     August 23, 2012**

{8}     The agents participated in other buys with Hall and Malchete between July 3 and August 23, but in none of those additional buys did Hall and Malchete go to Space 104; instead, they took the agents to different addresses to buy heroin. The agents began conducting surveillance on Space 104 on their own. At the inception of the August 23rd surveillance, the agents determined that they would stop any vehicle engaged in "suspicious activity" and also had a marked police unit waiting in the area to conduct such stops. The agents observed a gold SUV stop in the trailer park, drop off two passengers down the road from Space 104, and proceed to pull into Space 104's driveway. The vehicle remained there for three to five minutes, and the two remaining individuals in the SUV "made contact with the subject inside Space 104." The vehicle left Space 104, picked up the two passengers down the street, and exited the trailer park. Agent Arenibas testified that the agents noticed that the gold SUV was the same one they had seen parked outside 2801 Merriweather during the buy on August 10. When the SUV passed in front of the agents, they were able to see its license plate number, thereby confirming that the SUV was the same one that they had seen outside of 2801 Merriweather. The SUV having been parked at Space 104 for the short length of time it was parked there, and having dropped off and picked up the passengers down the street from Space 104, was consistent with drug

5

trafficking that the agents had observed during the previous undercover buys during their investigation. Based on the circumstances of this August 23rd buy and the similarities it had with the earlier undercover heroin purchases at Space 104 and at 2801 Merriweather, the agents believed that the occupants of the SUV were involved in picking up or purchasing heroin.

**{9}** Because of these similarities, as well as the same SUV's involvement, the agents requested that the marked police unit stop the SUV. The stop was conducted approximately one block away from the trailer park, minutes after the SUV pulled away from Space 104. The agents drove to the place where the marked unit had stopped the SUV, approached the vehicle, advised the occupants of the narcotics-related reason for the stop, and separated them. After a female passenger described Defendant as being the person with the heroin, Defendant was confronted by the agents, and eventually, Defendant voluntarily gave Agent Misquez a package of heroin.

## III.  Discussion

**Standard of Review**

**{10}** When we review an appeal from a determination on a motion to suppress in a criminal case, we look at the totality of circumstances. *State v. Leyva*, 2011-NMSC-009, ¶¶ 30, 59, 149 N.M. 435, 250 P.3d 861; *State v. Vandenberg*, 2003-NMSC-030, ¶ 19, 134 N.M. 566, 81 P.3d 19. We view the facts in a light most favorable to the prevailing party. *State v. Sewell*, 2009-NMSC-033, ¶ 12, 146 N.M. 428, 211 P.3d 885. At the same time, if the district court makes findings of fact, and

6

if any finding is attacked for lack of substantial evidence, we will review the finding under a substantial evidence standard of review. *State v. Neal*, 2007-NMSC-043, ¶ 15, 142 N.M. 176, 164 P.3d 57. If the finding is supported by substantial evidence, we will defer to the court's finding. *Id.* Once the operative facts are ascertained, we review the constitutional reasonableness of the actions of law enforcement. *Vandenberg*, 2003-NMSC-030, ¶ 19; *State v. Attaway*, 1994-NMSC-011, ¶¶ 6-10, 117 N.M. 141, 870 P.2d 103. A constitutional reasonableness analysis engages a process of evaluating both fact and law and is appropriately labeled a mixed question of fact and law. *Attaway*, 1994-NMSC-011, ¶¶ 6-7; *see generally* Randall H. Warner, *All Mixed Up About Mixed Questions*, 7 J. App. Prac. & Process 101 (2005). Despite the fact that our review requires determinations of what the operative facts are, because the process involves evaluative judgments in regard to reasonableness, we review the district court's determination de novo. *Vandenberg*, 2003-NMSC-030, ¶¶ 17, 19; *Attaway*, 1994-NMSC-011, ¶ 10.

**The Stop Was Supported by Reasonable Suspicion**

{11} The Fourth Amendment to the United States Constitution "prohibits unreasonable searches and seizures . . ., and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted).[3] While warrantless seizures are presumed to be unreasonable, *State v.*

---

[3] We limit our analysis to the federal constitution when the defendant does not argue on appeal how and why the New Mexico Constitution provides greater

7

*Rowell*, 2008-NMSC-041, ¶ 10, 144 N.M. 371, 188 P.3d 95, brief investigatory stops are permissible if they are supported by reasonable suspicion that criminal activity may be afoot. *Arvizu*, 534 U.S. at 273.

{12}    "[T]he concept of reasonable suspicion is somewhat abstract" and has not been reduced to a neat set of legal rules. *Arvizu*, 534 U.S. at 274. In reviewing a reasonable suspicion determination, an appellate court "must look at the totality of the circumstances" to determine "whether the detaining officer [had] a particularized and objective basis for suspecting legal wrongdoing." *Id.* at 273 (internal quotation marks and citation omitted). The appellate court must give due weight to the factual inferences and deductions drawn by a law enforcement officer based upon his experience and specialized training. *Id.* at 273-74. "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard[.]" *Id.* at 274 (internal quotation marks and citation omitted). Finally, we are not to engage in a "divide-and-conquer analysis[,]" looking at each act in a series of acts that, taken alone, may be susceptible of an innocent explanation. *Id.* "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Id.* at 277.

---

protection. *See generally State v. Lorenzo P.*, 2011-NMCA-013, ¶ 9, 149 N.M. 373, 249 P.3d 85. Defendant provides no such argument here. We therefore analyze Defendant's case only under the Fourth Amendment.

{13}     In Defendant's view, the agents' investigations "were fragmented and flawed," were based on their "hunch that [the SUV] was involved in drug-related activity[,]" and were not adequate to support reasonable suspicion and the seizure of the SUV. Defendant relies on *Neal*, 2007-NMSC-043. In *Neal*, a law enforcement officer effected a valid traffic stop of the defendant and then detained the defendant for ten minutes to await a drug dog to perform a perimeter sniff of his vehicle. *Id.* ¶¶ 1, 28, 31. Our Supreme Court held that the factual bases asserted by the officer to justify the ten minute detention did not satisfy the reasonable suspicion standard. *Id.* ¶ 31. The officer's stated grounds for detaining the defendant were that the defendant had parked in front of a house that was under surveillance in an ongoing drug investigation, the defendant had a discussion with the resident who was a felon, the officer's "belief that a drug transaction had taken place[,]" the defendant's demeanor, his desire to leave, and the fact that the defendant had a criminal history. *Id.* ¶¶ 9, 28, 30. The Court determined that the defendant's innocent conduct, presence at a known drug house, and prior involvement in drug-related activity were not sufficient to constitute reasonable suspicion to detain the defendant beyond the valid traffic stop. *Id.* ¶¶ 9, 23, 31. The Court reasoned that "[the d]efendant's mere association with a convicted felon . . ., who was under surveillance in an ongoing drug investigation, was insufficient to create reasonable suspicion[,]" *id.* ¶ 30, explaining that the totality of the facts presented did not "constitute the type of individualized, specific, articulable circumstances necessary to create reasonable suspicion that [the d]efendant himself was involved in criminal activity[.]" *Id.* ¶ 31. Instead, it

9

characterized the circumstances as "the type of conjecture and hunch we have rejected in the past as insufficient to constitute reasonable suspicion." *Id.*

{14} Defendant's reliance on *Neal* derives from his view that the SUV's mere presence at a house that was under investigation for suspected drug activity is inadequate to support reasonable suspicion. *See id.* ¶¶ 4, 28, 30 (stating, among other things, that the defendant's presence at a house that was under investigation for drug activity did not give rise to reasonable suspicion). We are not persuaded by this comparison. Here, the grounds for the agents' reasonable suspicion were based on far more than the SUV's mere presence at a suspected drug house.

{15} Further, Defendant's arguments ignore the teachings of *Arvizu*. *See* 534 U.S. 273-74. Defendant parses the agents' investigation and attacks the reasonableness of the underlying inferences and conclusions as to each stage of the investigation that, combined, ultimately led to the stop.[4]

{16} For example, Defendant argues that the agents "could not be certain" that the Merriweather address or Space 104 were sources of heroin. To that end, Defendant points to the facts that the agents did not see or hear any drug transaction at either address and did not confirm that Mendenhall, Hall, or Malchete were honest in their

---

[4] The special concurrence follows suit and goes further than Defendant by more finely parsing the facts with innocent explanations for the circumstances observed by the agents during their ongoing investigation. Defendant's and the special concurrence's approaches fail to consider the totality of the circumstances, fail to give due deference to law enforcement's training and experience, and engage in an unwarranted divide-and-conquer approach by attempting to find an innocent explanation for each piece and parcel of the ongoing investigation.

representations that they purchased heroin from either address by somehow ensuring that they did not have heroin before they went to those addresses or somehow confirming that they did not keep the agents' money themselves. Defendant's argument evokes the sense of certainty that is required in a probable cause determination, but it misses the mark in terms of the reasonable suspicion standard. *See Alabama v. White*, 496 U.S. 325, 330 (1990) (stating that because "[r]easonable suspicion is a less demanding standard than probable cause" it "can arise from information that is less reliable than that required to show probable cause"); *United States v. Cortez*, 449 U.S. 411, 418 (1981) (stating that the process of developing reasonable suspicion sufficient to justify a brief investigatory stop "does not deal with hard certainties, but with probabilities" developed from "common sense conclusions about human behavior . . . as understood by those versed in the field of law enforcement"). The agents' training and experience, their observations during the drug buys, and the involvements of the SUV, objectively support the agents' reasonable suspicion that the addresses were sources of heroin[5] and the SUV was

---

[5] Arguably, the agents' observations were sufficient to establish Mendenhall's and Hall's reliability even under the heightened standard of probable cause applicable to a search warrant. *See, e.g.*, *State v. Mejia*, 766 P.2d 454, 457 (Wash. 1989) (en banc) (considering the reliability of information gained from a middleman who purchased drugs for a confidential informant and concluding that law enforcement's observations of his travel to a suspected drug house, then back to the confidential informant to deliver drugs demonstrated probable cause); *State v. Morehouse*, 684 P.2d 1348, 1350 (Wash. Ct. App. 1984) (stating that, in the context of a search warrant for a suspected drug house, any deficiency concerning a middleman's reliability was overcome by law enforcement's "observation of two separate [drug] transactions involving the same residence and the same pattern of activity").

11

connected. *See Arvizu*, 534 U.S. at 273-74 (discussing the standard used to determine whether law enforcement "[had] a particularized and objective basis for suspecting legal wrongdoing" (internal quotation marks and citation omitted)).

{17} Defendant also attacks reasonable suspicion on the ground that neither the SUV nor its owner was known to have been previously involved in any suspicious, drug-related activity. Defendant states that "[t]he agents had not identified [to whom] at the Merriweather residence the SUV belonged . . . or if that person was, in fact, involved with drug sales." In support of this attack, Defendant relies on *State v. Graves*, 1994-NMCA-151, ¶ 8, 119 N.M. 89, 888 P.2d 971, for the inapplicable proposition that, in Defendant's words, "presence on the premises subject to a search warrant does not justify detaining or searching the defendant[.]" We are not made aware of any authority to support the notion that an investigatory stop requires law enforcement officers to know of prior suspicious or criminal activity or to know that the owner of the subject vehicle was "in fact" involved in criminal activity. Again, reasonable suspicion "does not deal with hard certainties, but with probabilities." *Cortez*, 449 U.S. at 418. Further, focusing on what the agents did know instead of what they did not know about the SUV, that is, its presence at the Merriweather address during a heroin purchase, its later presence at the Oñate Greens Trailer Park, and the fact that, while at the trailer park, it followed the particular pattern known to the agents to be associated with heroin purchases from Space 104, objectively supported the agents' reasonable suspicion of criminal activity. *See, e.g, United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005) (confirming that the totality of the circumstances firmly

12

established reasonable suspicion and that, although one event could be interpreted as an innocent one, "a pattern of behavior interpreted by the untrained observer as innocent may justify a valid investigatory stop when viewed collectively by experienced drug enforcement agents" (internal quotation marks and citation omitted)); *United States v. Harley*, 682 F.2d 398, 401 (2d Cir. 1982) (holding that reasonable suspicion supported an investigatory stop because the characteristics of the defendant's "brief stop" at a place that agents "were pretty well convinced" was a place that narcotics were being sold was typical of the activities related to narcotics sales that the law enforcement agents had previously observed); *United States v. Gomez*, 633 F.2d 999, 1004-05 (2d Cir. 1980) (holding that reasonable suspicion of criminal activity was supported by experienced police officers' observations in an area of high narcotics activity of a pattern of behavior that they had seen many times before, notwithstanding that "viewed singly by an untrained eye, these events might be susceptible of an innocent interpretation").

{18} In Defendant's next attack on whether the agents' investigation supported their reasonable suspicion, he argues that the agents "had no reason to be suspicious that illegal activity was occurring at Space 104" on the day that the SUV was seized. We disagree. The totality of the circumstances gave the agents sufficient objective reason to be suspicious of illegal drug-related activity. Again, the factors included Mendenhall's and Hall's respective heroin purchases from Space 104, the fact that the SUV was registered to a resident and was in the driveway during the previous Merriweather heroin transaction on August 10, and the occupants' actions that were

13

consistent with the pattern of drug-related behavior occurring during their investigation and the previous heroin purchases from Space 104.

{19} Finally, Defendant argues that "the agents were [not] operating under a specific, predictive tip that criminal activity was presently afoot[] or was about to occur." Consideration of a specific, predictive tip that criminal activity is about to occur may be relevant to a reasonable suspicion determination in a circumstance where a tip from an informant contributes to reasonable suspicion. *See State v. Robbs*, 2006-NMCA-061, ¶ 19, 139 N.M. 569, 136 P.3d 570 (concluding that an informant's tip was reliable and supported by reasonable suspicion because, among other things, it predicted the defendant's future movement as corroborated by law enforcement). Such considerations are not relevant here where the agents' reasonable suspicion stemmed from their own undercover investigation and surveillance and not from a tip from an informant.

{20} In sum, the totality of the circumstances known to the agents as a result of their undercover activities with Mendenhall, Hall, and Malchete, their surveillance of the Merriweather address and Space 104 during Mendenhall's and Hall's respective heroin purchases, the information gathered from Malchete, the presence of the SUV at both at-issue addresses, and the surveillance of Space 104 that ultimately led to the seizure of the SUV, amply supported the agents' reasonable suspicion that criminal activity was afoot when the marked police unit stopped the SUV. Through the course of their investigation, the agents gathered information that allowed them to observe a pattern of behavior associated with heroin transactions at the two specific addresses

14

that were reasonably sufficient, to link the SUV to both addresses and, ultimately, to connect the SUV belonging to a resident of the Merriweather address to the pattern of behavior associated with a suspected purchase of heroin from Space 104 on August 23, 2012. The "mere hunch" label is a stretch too far here. Viewed in total and with the required deference to the inferences and deductions drawn by the agents based on their experience and training, these circumstances were sufficient to give rise to more than a "mere hunch." *See Arvizu*, 534 U.S. at 273-74 (recognizing that a mere hunch will not support reasonable suspicion, but also recognizing that the appellate courts must give due weight to the factual inferences and deductions drawn by law enforcement based upon experience and specialized training). To the contrary, the circumstances here provided an objective basis upon which the agents could reasonably suspect criminal activity and conduct a lawful investigatory stop.

**CONCLUSION**

{21}     We affirm.

{22}     **IT IS SO ORDERED.**


 

        _____
        **JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**TIMOTHY L. GARCIA, Judge**

**RODERICK T. KENNEDY, Judge (specially concurring).**

**KENNEDY, Judge, (specially concurring).**

{23} It is impossible to ascertain whether, after a month and a half, the agents tired of their investigative methods and just decided to return to an "established drug house" to arrest someone. In my view, the facts here establish legitimate reasonable suspicion by barely a nose. Only upon a re-reading of this Opinion did a single fact convince me to concur. Self-reference and subjective hunch-confirming seems to abound without much hard evidence. The district court acknowledged that the agents saw no drugs at any point in their investigations on the day of Defendant's arrest leading up to the stop of the SUV and acknowledged that "none of the indicators shown here, on their own, taken individually, would provide reasonable suspicion."

{24} Knowing the deferential standard of review, however, I must reluctantly concur. I write to emphasize the objective standard we must apply and recall the law that "[q]uestions of reasonable suspicion are reviewed de novo by looking at the totality of the circumstances to determine whether the detention was justified." *Robbs*, 2006-NMCA-061, ¶ 9. Hindsight, whether investigative or judicial, creates a terrific bias for confirmation of bad evidence. The agents seem not to have once corroborated these "suspects'" stories with hard evidence, yet paint a barely sufficient picture for this appeal to sustain their actions. I question the quality of the evidence, even while I vote to affirm its sufficiency in this case.

{25} Our courts have routinely rejected adopting rules equating innocent conduct with reasonable suspicion, absent articulable suspicion of criminal activity. *Neal*, 2007-NMSC-043, ¶¶ 28-29; *see also Leyva*, 2011-NMSC-009, ¶ 24 (" 'Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.' " (quoting *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005))). Law enforcement officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. However, this does not mean that unsupported intuition and inarticulate hunches are sufficient to constitute reasonable suspicion justifying a detention." *Neal*, 2007-NMSC-043, ¶ 21 (alteration, omission, internal quotation marks, and citations omitted). The purpose for this objectivity "is to prevent officers from arbitrarily acting on whims or unsupported hunches[.]" *State v. Alderete*, 2011-NMCA-055, ¶ 11, 149 N.M. 799, 255 P.3d 377.

{26} There is no legal standard for where the "suspects" with whom the agents associated during this three-buy investigation fall on the contiuum of sources of information between anonymous tipsters, confidential informants, and identified sources. They certainly have no obligation to be honest; they were all actively

committing criminal acts with the agents asking them to do so. None of them ever allowed the agents near one of the "buys," saying in each instance that the individuals at those locations did not like strangers. This is a great opportunity for misdirection and the suspects' control of the circumstances. Mendenhall was arrested for other crimes in the course of the investigation. Hall and Malchete were also not confidential informants, because they, too, were "suspects," who on July 23, necessitated the agents staying together for "safety" when Hall went to make the buy at the "white trailer." Neither the term "suspect," nor the concern for officer safety bespeak any level of trust for these collaborators.

{27} In this case there are the three relevant events preceding the August 23 stop of the SUV: the Mendenhall buy at Space 104 on July 3, the July 23 "buy" that may or may not have occurred where Hall said it did, and seeing the SUV on Merriweather on August 10. In the first, Mendenhall went in, came out, and turned over drugs. Because the agents were acting as co-criminals with Mendenhall, who was not controlled by them or working off charges, they could not ascertain if he had drugs on his person before he went in, or still had their money when he came out.[6] Nothing

[6]This would be what's known as a "controlled buy": "[T]he informant entered the residence with some money and no drugs and came out of the residence a few minutes later with drugs and no money. The informant stated that he had purchased the packet of suspected heroin from [the d]efendant . . . . The informant then turned over the packet of suspected heroin to the police. The informant saw or perceived the facts asserted." *Lujan*, 1998-NMCA-032, ¶ 12.

appears in the record as to who occupied the trailer at Space 104, whether they had criminal records, or were innocent diversions for Mendenhall. *E.g.*, *State v. Barker*, 1992-NMCA-117, ¶ 2, 114 N.M. 589, 844 P.2d 839 (describing an informant's detailed contacts within a drug house). Regarding the SUV, as mentioned later, no facts establish its association with anyone dealing drugs at the Merriweather address on August 10. At the Merriweather buy, the "suspect" already had heroin with him, just "not enough" to satisfy the agents' request—without a controlled buy, it would be beyond the agents' capability to demonstrate how much heroin later turned over to the agents even came from the house. All of these buys rest only on the say-so of the "suspects" themselves, and the tunnel vision of the agents. Our deference may be little more than a gloss; the agents were quite unclear in their testimony about whether they recognized the SUV before or after the August 23 stop. However, the majority is correct that minute deconstruction is not the standard we must apply, and Defendant's doing so is unpersuasive in a "totality of the circmustances" deferential review.

{28} In *Alderete*, an established and reliable confidential informant gave well-corroborated information constituting "specific, predictive information" that was confirmed by police observation that drugs were being delivered to a house. A search warrant for the house had been obtained, and the officers knew it. *Alderete*, 2011-NMCA-055, ¶ 18. One vehicle had left the house; another capable of carrying such

boxes as had been delivered left ten minutes thereafter. The combination of facts and corroboration of a reliable informant's information supported reasonable suspicion to pull over the car. *Id.* ¶ 20. A confidential informant is someone who is known to the police, has assisted them with investigations, and whose information led to the seizure of controlled substances and many controlled substances related arrests. *Cf. State v. Whitley*, 1999-NMCA-155, ¶ 2, 128 N.M. 403, 993 P.2d 117. In this case, there are no reliable informants, no corroboration, and only one observed prior contact with Space 104 that was similar to the July 3 stop the agents made.

{29} The "suspects" did not testify here in support of the State to support the conclusions the agents made with actual facts from the buys. All the places from which the "suspects" bought drugs did not like new people, such as the agents, showing up. This trope kept the agents from the possibility of gathering corroborating evidence. The agents, because they were dealing with active criminal suspects and not an informant under their control, did not control the "buys" their compatriots made in their service that might have reduced what I regard as the uncertainty and risk of falsehood about the information provided by an informant. *State v. Steinzig*, 1999-NMCA-017, ¶¶ 23-24, 127 N.M. 752, 987 P.2d 409. I regard the "suspects" as less reliable than anonymous tipsters, whose information we have previously regarded as "generally less reliable than tips from known informants and can form the basis for reasonable suspicion only if accompanied by specific indicia of reliability, for

21

example the correct forecast of a subject's not easily predicted movements." *State v. Urioste*, 2002-NMSC-023, ¶ 12, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citation omitted).

{30}    The sole operative question is whether the stop of the SUV was justified at its inception. I am troubled with the agents' testimony that they had determined even before the SUV showed up that they would detain anyone involved in "suspicious activity" at Space 104 and had a patrol car already waiting for that purpose.

{31}    This case resembles *Alderete* in that the car in that case was stopped based on reasonable suspicion from the investigation, and not a traffic stop. The SUV showed up for a brief time, disgorged some passengers who had some contact with Space 104, returned to the car, and left. Since it is unclear whether the SUV was recognized at the time of the stop, the facts indicate that this stop occurred solely because of the agents' surveillance of Space 104 and their admitted predilection to stop any car that they thought was acting suspiciously. However, it fit the classic short-time turnaround of a typical drug transaction, and the totality of the circumstances as found by the district court gets the deferential nod.

{32}    *Neal* is just a whisker on the other side of the line from this case. In *Neal*, an officer lacked reasonable suspicion to detain an individual in order to search for drugs where the officer observed the defendant, who had prior drug-related convictions, stop briefly in front of a house and speak to a known felon who resided at the house

22

and was under investigation for drug trafficking. 2007-NMSC-043, ¶ 28. The officer had no specific information that criminal activity had occurred. *Id.* Our Supreme Court held that the defendant's suspicious behavior, presence at a known drug house, and prior involvement in drug-related activity were not sufficient to constitute reasonable suspicion to detain the defendant beyond the valid traffic stop. *Id.* ¶ 23. The Court reasoned that "[the d]efendant's mere association with a convicted felon . . . who was under surveillance in an ongoing drug investigation[] was insufficient to create reasonable suspicion." *Id.* ¶ 30. The Court explained that the totality of the facts presented did not "constitute the type of individualized, specific, articulable circumstances necessary to create reasonable suspicion that [the d]efendant . . . was involved in criminal activity," *id.* ¶ 31, and instead characterized the circumstances as "the type of conjecture and hunch we have rejected in the past as insufficient to constitute reasonable suspicion." *Id.*

{33}    In *State v. Ochoa*, an officer surveilling a house for drug trafficking observed an unknown vehicle at the house, at the officer's request, another officer stopped the vehicle in order to identify and question the driver. 2009-NMCA-002, ¶ 2, 146 N.M. 32, 206 P.3d 143. We held that the officer, based on these facts, "lacked a constitutionally reasonable suspicion that [the d]efendant was involved in drug activity" to justify the stop. *Id.* ¶ 45. We concluded that the stop was pretextual because the officer lacked reasonable suspicion to support the underlying basis for

23

the stop—investigation of drug activity. *Id.* ¶ 46. Here, I recall the agents' intention to stop any suspicious vehicle that stopped at Space 104. Only they were defining "suspicious" at that point.

{34} I regard the reasoning we used in *State v. Prince*, 2004-NMCA-127, 136 N.M. 521, 101 P.3d 332, worthy of repeating, as we held there that the combination of being under investigation for drug involvement and a tip tying the defendant's movements to drug activity were insufficient to constitute reasonable suspicion to detain the vehicle beyond a valid traffic stop.

> Guilt by association and generalized suspicions are insufficient grounds upon which to base an investigatory detention. In the absence of specific and particularized incriminating information about the criminal activity that the defendant is or is about to [be] engage[d] in, *generalized suspicions and mere corroboration of innocent activity*, even if it is not readily available to the general public, *is insufficient to create reasonable suspicion for an investigatory detention*.

*Id.* ¶ 17 (emphasis added). However, because I believe the totality of the circumstances in this case barely supports our conclusion, I can join the majority in applying the standard of review in this case. I therefore concur.

_____
**RODERICK T. KENNEDY, Judge**